MICHIGAN CITIZENS FOR WATER CONSERVATION v
NESTLÉ WATERS NORTH AMERICA INC

Docket Nos. 254202, 256153. Submitted June 14, 2005, at Lansing.
Decided November 29, 2005, at 9:00 a.m. Leave to appeal sought.

Michigan Citizens for Water Conservation (MCWC) and others
brought an action in the Mecosta Circuit Court against Nestlé
Waters North America Inc. and others, alleging violations of
various common-law doctrines and environmental statutes in
connection with Nestlé's withdrawal of groundwater for sale as
bottled spring water. The plaintiffs moved for summary disposition
on their allegations that the withdrawal of water was unlawful
under the common law applicable to riparian rights and to
groundwater and was a violation of the public trust. The court,
Lawrence C. Root, J., determined that the plaintiffs' common-law
claims were governed by the law applicable to groundwater
withdrawals rather than riparian law, but ruled that diminish-
ment of riparian flow could constitute an actionable injury under
groundwater law. The court granted the defendants summary
disposition with respect to the claims concerning riparian rights
and the public trust, and the case proceeded to a bench trial on the
plaintiffs' groundwater claim and their claim under the Michigan
environmental protection act (MEPA), MCL 324.1701 et seq. The
court concluded that Nestlé's groundwater withdrawals had
harmed and will continue to harm the plaintiffs' riparian interests
and violated MEPA. The court enjoined Nestlé from withdrawing
any water from the area affected. The Court of Appeals, METER,
P.J., WHITBECK, C.J., and GRIFFIN, J., granted a stay of the injunc-
tion, but imposed a limitation on Nestlé's pumping rate in an
unpublished order entered December 16, 2003 (Docket No.
252717). The trial court subsequently amended the judgment to
correct minor factual errors, but otherwise denied Nestlé's motion
for a new trial or amendment of the judgment and its request to
submit additional evidence. The trial court awarded costs to the
plaintiffs as prevailing parties. In Docket No. 254202, Nestlé
appealed the trial court's order, and the plaintiffs cross-appealed
the dismissal of their public trust claim. In Docket No. 256153,
Nestlé appealed the order granting costs.

The Court of Appeals *held*:

1. The trial court's findings of fact were not clearly erroneous. While one might disagree with the specific findings made, they were adequately and plausibly supported by the testimony and documentary evidence. It was for the trial court to resolve issues regarding the weight and credibility of the expert opinions presented. There were no factual errors warranting a new trial.

2. The trial court did not abuse its discretion by refusing to reopen the proofs. When evaluating whether a trial court abused its discretion on a motion to reopen the proofs, a reviewing court will consider (1) the timing of the motion, (2) whether the adverse party would be surprised, deceived, or disadvantaged by reopening the proofs, and (3) whether there would be inconvenience to the trial court, the parties, or counsel. Reopening the proofs in this complicated environmental case would necessitate further expert testimony regarding the proper interpretation of the data. Because data were continuously collected, the potential existed for a never-ending cycle of new evidence and interpretation. The trial court made its ruling on the basis of valid considerations of finality and the limited probative value of new data given the long-term data already available.

3. The trial court erred by applying a hybrid rule of its own making to the plaintiffs' claim that Nestlé's groundwater withdrawals unlawfully interfered with their riparian rights. The reasonable use balancing test first stated in *Dumont v Kellogg*, 29 Mich 420 (1874), for competing riparian owners also applies to groundwater use and is the law applicable to disputes between riparian and groundwater users. The process of balancing competing water uses seeks to ensure a fair participation in the use of water for the greatest number of users, and a court should attempt to strike a proper balance between protecting the rights of the complaining party and preserving as many beneficial uses of the common resource as is feasible under the circumstances. The use itself must be reasonable, and a water use that has little value or is excessive or harmful is not entitled to protection. The law will redress only unreasonable harms. Thus, a plaintiff must demonstrate that the defendant's use of the water substantially interfered with the plaintiff's own reasonable use.

4. While the nature of the reasonable use balancing test requires that the appropriate factors be ascertained on a case-by-case basis, several factors will always be relevant. These include (1) the purpose of the water use, (2) the suitability of the use to the location, (3) the extent and amount of harm, (4) the benefits of the

use, (5) the necessity of the amount and manner of the water use, and (6) any other facts that may bear on the reasonableness of the use.

5. When determining the purpose of the water use for the first factor, the court should consider whether the use is for a natural or an artificial purpose and whether the use benefits the land from which the water is extracted. Natural uses include those uses necessary to the existence of the user and his or her family, such as use of the water for drinking and household needs. Artificial uses are those that increase one's comfort and prosperity but are not essential to existence, such as uses for commercial profit and recreation. Natural water uses are preferred over artificial uses. Water uses that benefit the riparian land or the land from which the groundwater was removed are given preference over uses that ship the water away or otherwise benefit land unconnected with the location from which the water was extracted.

6. To assess the suitability of the use to the location, the court should examine the nature of the water source and its attributes, including the size of the water source. The uses to which a particular water source is customarily put are relevant to determining whether a new use is suitable to the area. The use must fit into the pattern of other uses to cause as little disruption as possible.

7. With regard to the third and fourth factors, the court should examine not only the economic harm and benefits to the parties, but also the social benefits and costs of the water use, such as its effect on fishing, navigation, and conservation. Negative social effects should weigh against the use, while positive social effects should weigh in favor of a determination of reasonableness. The traditional use employed in the locality of the resource may be a guide to what the community considers reasonable. The protection of existing water uses is also an important consideration.

8. With respect to the fifth factor, the court should examine the extent, duration, necessity, and application of the use, including any effects on the quantity, quality, and level of the water. An excessive or unnecessary amount or method of water use that harms another's use is unreasonable. The failure to take steps or make modifications that can readily mitigate or eliminate the harm caused by a water use may make the particular use unreasonable.

9. Applying the factors to this case, Nestlé's proposed withdrawals at the maximum rate permitted would be unreasonable under the circumstances. The trial court correctly determined that Nestlé's water withdrawals unlawfully interfered with the plain-

tiffs' riparian water uses, albeit for the wrong reason. The plaintiffs alleged that Nestlé's groundwater withdrawals interfered with their right to use the Dead Stream for recreational boating, wildlife observation, swimming, and fishing and diminished the aesthetic value of their riparian land. Such recreational and aesthetic uses, including the use of riparian waters as a restful retreat, are reasonable uses worthy of protection. Nestlé's use of the water serves a beneficial purpose through employment and investment in the community, and the provision of water to the general public is an economically and socially beneficial use of the water. All parties use the water for artificial purposes, but the plaintiffs' uses are directly related to the use and enjoyment of their riparian lands. Given the dramatic effect of the proposed withdrawals on stream levels and flow, and the recreational uses traditionally made of the bodies of water involved, the area is not well suited for high-volume water extraction. The harms inflicted on the riparian plaintiffs and the community are significantly offset by the economic benefits. Nestlé has other options for obtaining suitable water for use at its plant, however, and need not maintain such a high pumping level. Permitting groundwater withdrawals at the maximum rate would provide Nestlé more than a fair participation in the common water resources. Because Nestlé is in the best position to spread the costs incurred by a reduction in its water use, it should bear a greater portion of that burden.

10. Because of the unique nature of riparian rights, an injunction of limited scope is the only adequate remedy to the extent that Nestlé's water withdrawals are inconsistent with the plaintiffs' correspondent right to make use of the same water resources. The plaintiffs will suffer substantial harm to their riparian rights if the maximum pumping rate is permitted, and they have no adequate remedy at law because an award of damages in gross for the complete loss of their riparian rights is inappropriate. On remand, the trial court must hold a hearing to determine what level of water extraction will meet the criteria outlined and modify its injunction accordingly.

11. The plaintiffs have standing to allege a MEPA claim with respect to all the natural resources at issue in this case. There was no evidence that the plaintiffs actually used or physically participated in activities on the Osprey Lake impoundment and wetlands 112, 115, and 301. Because of the complex, reciprocal nature of the ecosystem involved and the hydrologic interaction, connection, or interrelationship between all the water resources and Nestlé's pumping activities, however, environmental injuries to the im-

poundment and those wetlands play a role in any harm caused to the Dead Stream, its wetlands, and Thompson Lake, which are bodies of water used by, and adjacent to property owned by, the plaintiffs and not subject to a standing challenge. As such, the plaintiffs could allege an injury in fact or an invasion of a legally protected interest where concrete harm was caused not only to the natural resources bounding their properties but also the other outlying resources, without relying on the MEPA standing provision, MCL 324.1701(1).

12. The trial court erroneously determined that the plaintiffs had established a prima facie violation of MEPA. A plaintiff in a MEPA action must make a prima facie case that the defendant has or is likely to pollute, impair, or destroy the air, water, or other natural resources. MEPA, however, does not impose specific requirements or standards. Instead, the trial court must (1) make detailed and specific findings with regard to the defendant's conduct or (2) examine the validity, applicability, and reasonableness of a pollution control standard fixed by statute or rule. If the primary purpose of a statute used as a pollution control standard is to protect the natural resources or to prevent pollution and environmental degradation, a violation of that statute can establish a prima facie case under MEPA. The trial court did not make specific findings in this case, but adopted the inland lakes and streams act (ILSA), MCL 324.30101 *et seq.*, and the wetlands protection act (WPA), MCL 324.30301 *et seq.*, as MEPA standards, and determined that the plaintiffs had met their prima facie burden because Nestlé's conduct violated those standards. While those statutes may serve as aids when establishing impairment standards, neither is a pollution control standard. Because the trial court relied on statutes that were not pollution control standards and failed to make the necessary findings, that portion of the order concluding that Nestlé's water withdrawals violate MEPA must be vacated, and the case must be remanded for a determination whether the plaintiffs established a prima facie MEPA violation.

13. The trial court properly determined that the Dead Stream is not subject to the public trust and properly dismissed the plaintiffs' public trust claim. The only bodies of water subject to the public trust in Michigan are navigable bodies of water, which are those lakes and streams that meet the log-floatation test for navigability. That test requires the capacity to float large mill logs. The plaintiffs could have demonstrated that the stream was navigable by presenting evidence that it was historically used to float logs, by demonstrating through tests that the stream can

actually support the floatation of logs, or through comparison with streams already determined to be navigable, but failed to do so.

14. The trial court abused its discretion by awarding as costs expert witness fees not authorized by statute or court rule. Because the plaintiffs were prevailing parties, an award of costs is appropriate. Moreover, the costs allowed under MEPA pursuant to MCL 324.1703(3) are the same as the costs allowed under the part of the Revised Judicature Act governing costs, MCL 600.2401 *et seq.* Expert witnesses are not automatically entitled to compensation for all services rendered, however, but are properly compensated for court time and the time required to prepare for their testimony as experts. Conferences with counsel for purposes such as educating counsel about expert appraisals, strategy sessions, and critical assessment of an opposing party's position are not compensable with expert witness fees. Despite ample evidence from which to assess the reasonableness of the requested expert witness fees, the trial court determined that it would be too difficult to separate the taxable costs from the nontaxable costs and improperly accepted the plaintiffs' characterization of the expert witnesses' activities as being for trial even though the court believed some of the fees were nontaxable. The award of costs must be reversed and remanded for recalculation.

Affirmed is part, reversed in part, and remanded for further proceedings; stay modified and continued.

SMOLENSKI, J., would conclude that the plaintiffs lack standing to sue under MEPA for claims concerning the Osprey Lake impoundment and wetlands 112, 115, and 301. As a nonprofit organization, the MCWC has standing to the same extent as its members. No member of the MCWC, including the individual plaintiffs, however, uses these bodies of water, and thus the plaintiffs cannot demonstrate that they have suffered or would suffer a concrete and particularized injury distinct from that of the public generally. While MCL 324.1701(1) purports to grant standing to any person to bring a MEPA claim, *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608 (2004), decided after the trial court's opinion in this case, determined that the Legislature is without authority to expand standing beyond the limits imposed by the Michigan Constitution. To the extent that MCL 324.1701(1) confers standing broader than those limits, it should be held unconstitutional.

MURPHY, P.J., concurred with Judge SMOLENSKI's opinion in all respects except its conclusion regarding the plaintiffs' standing to raise their MEPA claim.

WHITE, J., concurred with Judge MURPHY's opinion regarding MEPA standing, and concurred with Judge SMOLENSKI's opinion with respect to the groundwater and public trust claims and the ancillary issues. Judge WHITE wrote separately to state that, while a mere failure to obtain a permit under ILSA or the WPA does not establish a prima facie violation of MEPA, the trial court did not erroneously adopt the permitting provisions of those statutes as applicable pollution control standards. The trial court expressly stated its understanding that this case involves impairment rather than pollution, and referred to ILSA and the WPA for guidance in developing an impairment standard. Because the trial court did not explain how its earlier findings of fact revealed a level of impairment requiring judicial intervention under MEPA, however, the case must be remanded.

1. TRIAL — MOTIONS TO REOPEN PROOFS — STANDARD OF REVIEW.

A motion to reopen the proofs is a matter within the trial court's discretion; an abuse of discretion is found when an unprejudiced person, considering the facts on which the trial court relied, would find no justification or excuse for the ruling made; when evaluating whether a trial court abused its discretion on a motion to reopen the proofs, a reviewing court should consider (1) the timing of the motion, (2) whether the adverse party would be surprised, deceived, or disadvantaged by reopening the proofs, and (3) whether there would be inconvenience to the court, the parties, or counsel.

2. WATERS AND WATERCOURSES — COMPETING WATER USES — RIPARIAN AND GROUNDWATER USE — REASONABLE USE BALANCING TEST.

A reasonable use balancing test that ensures a fair participation in the use of water for the greatest number of users, protects a use that is itself reasonable, and redresses substantial interference with another's reasonable use is the test that applies to riparian use, groundwater use, and disputes between riparian and groundwater users; the appropriate factors to determine what constitutes a reasonable use in the case of competing water uses must be ascertained on a case-by-case basis, but include (1) the purpose of the use, (2) the suitability of the use to the location, (3) the extent and amount of the harm, (4) the benefits of the use, (5) the necessity of the amount and manner of the water use, and (6) any other factor that may bear on the reasonableness of the use.

3. DAMAGES — RIPARIAN RIGHTS.

An award of damages in gross for the complete loss of riparian water rights is inappropriate and is not an adequate remedy at law.

4. ENVIRONMENT — MICHIGAN ENVIRONMENTAL PROTECTION ACT — PRIMA FACIE
   CASE — POLLUTION CONTROL STANDARDS.

A trial court may determine that a plaintiff has established a prima
facie case of a violation of the Michigan environmental protection act
(MEPA) by (1) making detailed and specific findings that the defen-
dant's conduct has polluted, destroyed, or impaired, or is likely to
pollute, impair, or destroy, the air, water, or other natural resources or
(2) finding that the defendant has violated an applicable pollution
control standard fixed by rule or statute; a violation of a statute used
as a pollution control standard can establish a prima facie case under
MEPA if the purpose of the statute is to protect the natural resources
or to prevent pollution and environmental degradation; the inland
lakes and streams act and the wetlands protection act are not
pollution control standards for which a violation can support a prima
facie violation of MEPA (MCL 324.1701[1] and [2], 324.30101 *et seq.*,
324.30301 *et seq.*).

5. NAVIGABLE WATERS — PUBLIC TRUST DOCTRINE — TEST FOR NAVIGABILITY.

The public trust doctrine in Michigan applies only to navigable
waters, which are those lakes and streams that have a capacity to
float large mill logs; the fact that a stream may not be able to float
a mill log in an ordinary stage of water does not alter its navigable
character because the public right is determined by a valuable
rather than a continual use; navigability may be shown by
evidence that a stream was historically used to float logs, by
demonstrating through tests that the stream can actually support
the floatation of logs, or through comparison with streams already
determined to be navigable.

6. COSTS — MICHIGAN ENVIRONMENTAL PROTECTION ACT — EXPERT WITNESS
   FEES — TRIAL PREPARATION.

The costs allowed under the Michigan environmental protection act
are the same as the costs allowed under the part of the Revised
Judicature Act governing costs; expert witnesses are properly
compensated for court time and the time required to prepare for
their testimony as expert witnesses, but conferences with counsel
for purposes such as educating counsel about expert appraisals,
strategy sessions, and critical assessment of an opposing party's
position are not properly compensable with expert witness fees
(MCL 324.1701[3], 600.2401 *et seq.*).

*Olson, Bzdok & Howard, P.C.* (by *James M. Olson*
and *Scott W. Howard*); *Chris A. Shafer*; and *Samuels
Law Office* (by *James R. Samuels*) for Michigan Citi-

zens for Water Conservation, R. J. and Barbara Doyle, and Jeffrey R. and Shelly M. Sapp.

*Mika Meyers Beckett & Jones PLC* (by *John M. DeVries, Fredric N. Goldberg,* and *Douglas A. Donnell*), *Warner Norcross & Judd LLP* (by *Eugene E. Smary* and *Robert J. Jonker*), *Kilpatrick Stockton LLP* (by *David M. Zacks* and *Adam H. Charnes*), and *Porteous Law Office, P.C.* (by *David L. Porteous*), for Nestlé Waters North America Inc.

Amici Curiae:

*McClelland & Anderson, L.L.P.* (by *Gregory L. McClelland* and *Melissa A. Hagen*), for the Michigan Association of Realtors.

*Smith, Martin, Powers & Knier, P.C.* (by *David L. Powers*); and *Bancroft Associates PLLC* (by *Viet D. Dinh* and *Christopher D. Thuma*) for Save Our Shoreline.

*Noah D. Hall* for the National Wildlife Foundation, the Michigan United Conservation Clubs, and the Michigan Council of Trout Unlimited.

*Eric D. Williams* for the Mecosta County Development Corporation, Michigan Works! West Central, and the Mecosta County Area Chamber of Commerce.

*Koernke & Crampton, P.C.* (by *Thomas F. Koernke*), for the Michigan Water Environment Association.

*Law, Weathers & Richardson, P.C.* (by *Clifford H. Bloom* and *Michael J. Roth*), for the Michigan Lake & Stream Associations, Inc.

*Honigman Miller Schwartz and Cohn LLP* (by *John D. Pirich, Timothy Sawyer Knowlton, Grant R. Trigger,* and *S. Lee Johnson*) for the Michigan Chamber of

Commerce, the Michigan Chemistry Council, and the Michigan Agri-Business Association.

*Clark Hill PLC* (by *F. R. Damm, David D. Grande-Cassell,* and *Aaron O. Matthews*) for the Michigan Manufacturers Association.

*McKay & McKay* (by *Lawrence I. McKay III*) for the Anglers of the AuSauble, Inc.; and the Great Lakes. Council, Inc. of the Federation of Fly Fishers.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *S. Peter Manning* and *Sara R. Gosman,* Assistant Attorneys General, for the Department of Environmental Quality.

*Michael A. Cox,* Attorney General, for the Attorney General.

Before: MURPHY, P.J., and WHITE and SMOLENSKI, JJ.

SMOLENSKI, J. In Docket No. 254202, defendant Nestlé Waters North America Inc. (Nestlé) appeals as of right the trial court's imposition of an injunction barring it from withdrawing any groundwater from property owned by Donald Patrick Bollman and Nancy Gale Bollman, doing business as Pat Bollman Enterprises (the Bollmans).[1] Plaintiffs cross-appeal the trial court's earlier decision to grant defendants partial summary disposition on plaintiffs' public trust claim. In Docket No. 256153, Nestlé appeals as of right the trial court's grant of costs to plaintiffs.[2] We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

---

[1] The Bollmans did not take part in this appeal.

[2] The appeals in Docket Nos. 256153 and 254202 were consolidated on January 27, 2005.

I. FACTS AND PROCEDURAL HISTORY

The events leading to this appeal began when Nestlé's predecessor in interest, Great Spring Waters of America, Inc., a subsidiary of Perrier Group of America, Inc.,[3] began taking steps to construct a spring water bottling plant in Mecosta County. In December 2000, defendant purchased the groundwater rights to the Bollmans' property located north of the Osprey Lake impoundment and referred to as Sanctuary Springs.[4] The Osprey Lake impoundment is a man-made body of water created by the damming of the Dead Stream.[5] The Dead Stream originates from springs that are now obscured by the Osprey Lake impoundment and flows generally east and then south until it meets the channel between Blue Lake and Lake Mecosta. Shortly after defendant announced its plans to build its spring water bottling plant, the nonprofit corporation Michigan Citizens for Water Conservation (MCWC) was formed to represent the interests of riparian property owners[6] in the vicinity of the proposed wells, as well as other interested persons.

---

[3] During the course of the litigation, Great Spring Waters of America, Inc., changed its name to Nestlé Waters North America Inc. "Defendant" will be used to refer interchangeably to Nestlé, Great Spring Waters, and Perrier.

[4] Defendant selected the Sanctuary Springs location in order to withdraw water that met the federal requirements to market it as spring water. In order to do this, defendant must obtain the water from a source with a direct hydrologic and geochemical relationship to a spring. 21 CFR 165.110(a)(2)(vi).

[5] The Dead Stream was originally dammed in 1953 by the Sapp family. After purchasing the property, the Bollmans enlarged the impoundment with a new dam built sometime around 1980.

[6] Land that includes or abuts a river is riparian. *Dyball v Lennox*, 260 Mich App 698, 705 n 2; 680 NW2d 522 (2004). While some MCWC members own property on lakes and, therefore, might more accurately be referred to as littoral owners, for ease of reference the term "riparian" shall be used throughout this opinion to refer to both littoral and riparian interests. See *id.*

In January and February 2001, defendant installed two wells on the Sanctuary Springs site. Two more wells were installed in July and August 2001. Permits to use the wells were issued by the Michigan Department of Environmental Quality (DEQ) in August 2001 and February 2002. The combined maximum pumping rate permitted for the four wells is 400 gallons per minute (gpm).

In the summer of 2001, defendant began to construct its bottling plant approximately 12 miles from Sanctuary Springs.[7] In June 2001, the MCWC[8] filed a complaint, which in part sought an injunction against the construction of the bottling plant. The trial court denied the MCWC's request for an injunction because the construction of the plant did not itself constitute the harm sought to be enjoined by the MCWC.[9]

In September 2001, the MCWC filed its first amended complaint.[10] In count I, the MCWC requested an injunction against defendant's construction of wells, wellhouses, and the pipeline for water extraction from Sanctuary Springs. Count II alleged that defendant's

---

[7] Defendant intended to pump the water from Sanctuary Springs through a pipeline to its plant.

[8] Plaintiffs R.J. Doyle and Barbara Doyle (the Doyles) and Jeffrey R. Sapp and Shelly M. Sapp (the Sapps) were not parties to this initial complaint, but did file affidavits on the MCWC's behalf. The Doyles own property along the Dead Stream, and the Sapps own property along Thompson Lake, a small lake just south of the Osprey Lake impoundment. The Doyles and the Sapps are members of the MCWC.

[9] However, the trial court noted that, while defendant could proceed to build the plant, "Perrier will have to assume the . . . risks that accompany business decisions in the face of contentious environmental litigation and permitting processes. . . . [H]aving done so to its detriment will not be considered as an . . . argument against future equitable proceedings . . . ."

[10] The first amended complaint was entered by stipulation of the parties on October 8, 2001.

withdrawal of water would not be lawful under the common law applicable to riparian water rights. Count III alleged that defendant's withdrawal of water was unreasonable under the common law applicable to groundwater. Count IV alleged that the waters of Sanctuary Springs are subject to the public trust and, consequently, defendant is without the power to withdraw, divert, diminish, or use the water in a way that alienates or destroys the public's title. Count V alleged that defendant's use of the waters would constitute an unlawful taking of public resources. Finally, count VI alleged that defendant's withdrawals would violate the Michigan environmental protection act (MEPA).[11] Later the Bollmans were added as defendants, and in November 2001, plaintiffs filed a second amended complaint, which restated the counts of the first amended complaint, but added the Doyles and the Sapps as plaintiffs.

In May 2002, plaintiffs filed a motion for summary disposition on counts II to IV.[12] In opposition to plaintiffs' motion for summary disposition, defendant argued that the riparian and public trust doctrines did not apply to defendant's withdrawal of groundwater. In its ruling, the trial court stated, as a matter of law, that the Dead Stream was not navigable and, therefore, the public trust doctrine did not apply to it. The court also determined that plaintiffs' common-law claims were not governed by riparian law, but by the law applicable to groundwater withdrawals. However, the trial court ruled that diminishment of riparian flow could constitute an actionable injury under groundwater law.[13] For

---

[11] MCL 324.1701 et seq.

[12] Although plaintiffs never actually stated that their motion was made under MCR 2.116(C)(10), the trial court treated it as such.

[13] This issue arose again on the morning the trial was set to begin, and the trial court clarified that

these reasons, the trial court granted summary disposition in favor of defendants with respect to count II (riparian rights) and count IV (public trust). At a later summary disposition hearing, the trial court concluded that count V failed to state a claim and dismissed it as well.[14] As a result of these pretrial proceedings, the only counts remaining to be tried were plaintiffs' common-law groundwater claim (count III) and MEPA claim (count VI).[15]

The bench trial commenced on May 5, 2003, and ended on September 10, 2003. On November 25, 2003, the trial court issued its opinion and order. With regard to count III, the trial court found that defendant's pumping had harmed and will continue to harm plaintiffs' riparian interests. The trial court also determined that defendant's water withdrawals violated MEPA by unlawfully diminishing an inland lake or stream and draining water from a wetland. The trial court concluded that these violations warranted a full injunction and ordered defendant to terminate all water withdrawals from Sanctuary Springs within 21 days of the date of the filing of its opinion and order.[16]

the Court construes the issues before the Court, as expanded on in the ruling of October 4, 2002, to indicate that in looking at this case, the Court will consider riparian rights in relationship to the groundwater withdrawals and that whatever effects may result to riparian bodies, . . . those issues are considered to be before the Court . . . , realizing that counsel may have some arguments regarding the actual law to apply.

[14] Plaintiffs have not appealed the grant of summary disposition in favor of defendants on counts II and V.

[15] The injunctive relief requested in count I was mooted when defendant completed construction of the wells, wellhouses, and pipeline.

[16] On December 5, 2003, defendant moved for the suspension or modification of the injunctive relief pending its motion for a new trial and eventual appeal to this Court. After the trial court denied this motion, defendant filed an emergency application for leave to appeal. On Decem-

On December 16, 2003, defendant moved for a new trial and amendment of the judgment under MCR 2.611 and 2.612. Defendant asked the trial court to set aside its opinion and order of November 25, 2003, take additional testimony and receive additional exhibits, make new findings, direct entry of a new judgment, and refer the matter to the DEQ. On February 13, 2004, the trial court issued an opinion and order on defendant's motions for a new trial and other relief. The trial court acknowledged some minor factual errors in its previous opinion and amended it to correct them, but in all other respects rejected defendant's arguments and denied the requested relief.

On December 8, 2003, plaintiffs moved for costs under MCL 600.2164 and MCL 324.1703(3). At a May 7, 2004, hearing, the trial court awarded costs to plaintiffs, as prevailing parties, in the amount of $122,212.47. On May 27, 2004, plaintiffs moved for clarification or amendment of the trial court's order.[17] Plaintiffs noted that the trial court's earlier order granted plaintiffs' request as prevailing parties, but did not grant costs as an apportionment in the interests of justice under MEPA. Plaintiffs asked the trial court to amend its opinion and order to reflect that the grant had two independent bases: as prevailing parties and as an apportionment in the interests of justice. Defendant also moved for a stay of the order granting plaintiffs

ber 16, 2003, this Court issued an order granting defendant's request for a stay of the injunction with the condition that defendant's pumping output on a monthly average basis not exceed 250 gpm. See unpublished order of the Court of Appeals, entered December 16, 2003 (Docket No. 252717).

[17] On May 26, 2004, defendant appealed the trial court's grant of costs to plaintiffs, but this Court dismissed the claim for lack of jurisdiction. Unpublished order of the Court of Appeals, entered July 1, 2004 (Docket No. 255793).

costs on the basis that defendant might prevail on appeal. On May 27, 2004, the trial court held a hearing on the parties' motions, granted plaintiffs' request to amend the grant of costs to include apportionment under MEPA, and denied defendant's request for a stay.[18]

On March 4, 2004, under Docket No. 254202, defendant appealed as of right the trial court's November 25, 2003, opinion and order as amended and supplemented on February 13, 2004. On March 22, 2004, plaintiffs filed a claim of cross-appeal challenging the trial court's dismissal of plaintiffs' public trust claim. On June 17, 2004, under Docket No. 256153, defendant appealed as of right the trial court's grant of costs to plaintiffs.[19]

II. FACTUAL FINDINGS

We shall first address defendant's argument that the trial court's findings were clearly erroneous and that the trial court abused its discretion by refusing to grant defendant's request to reopen the proofs or supplement the record.

A. STANDARDS OF REVIEW

This Court reviews the findings of fact in a bench trial for clear error. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). A finding is clearly erroneous when, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. *Id.* The clear

---

[18] The trial court entered its order granting plaintiffs' motion for clarification or amendment on June 10, 2004.

[19] On June 23, 2004, defendant filed a motion with this Court asking for a stay of the grant of costs pending appeal, which this Court granted. See unpublished order of the Court of Appeals, entered July 1, 2004 (Docket No. 256153).

error standard is highly deferential to the trial court
and requires that regard be given to the trial court's
special opportunity to judge credibility. MCR 2.613(C);
*People v McSwain*, 259 Mich App 654, 683; 676 NW2d
236 (2003). This Court may not reverse the findings of
the trier of fact simply because it is convinced that it
would have decided the case differently. *Beason v Bea-
son*, 435 Mich 791, 803; 460 NW2d 207 (1990), citing
*Anderson v Bessemer City*, 470 US 564, 573-574; 105 S
Ct 1504; 84 L Ed 2d 518 (1985). On the contrary, if, on
the record as a whole, the trial court's account of the
evidence is plausible, this Court may not reverse. *Bea-
son, supra* at 803. However, this Court will give less
deference to the factual findings of trial judges than to
the factual findings of juries and will not tacitly endorse
obvious errors under the guise of deference. *McSwain,
supra* at 682-683.

A motion to reopen the proofs is a matter within the
discretion of the trial court. *Bonner v Ames*, 356 Mich
537, 541; 97 NW2d 87 (1959). An abuse of discretion is
found when an unprejudiced person, considering the
facts on which the trial court relied, would find no
justification or excuse for the ruling made. *McSwain,
supra* at 685.

### B. FINDINGS OF FACT

Defendant argues that the trial court's findings are
speculative and not supported by the record.[20] We
disagree.

---

[20] Although defendant makes reference to factual errors outlined in a
chart contained within the introduction to its brief and to errors
addressed in its motion for a new trial, we decline to address these alleged
errors because they were not adequately briefed. See *People v Van
Tubbergen*, 249 Mich App 354, 364-365; 642 NW2d 368 (2002).

### 1. WETLANDS

Defendant first questions how the trial court could find that the predicted drop in the water level of wetlands 112, 115, 301 and the Dead Stream wetlands would exceed the predictions of both defendant's and plaintiffs' experts.

For wetland 112, the trial court adopted the opinion of plaintiffs' groundwater expert, Dr. David Hyndman, as well as "the other corroborating evidence referred to," and found that "wetland 112 will drop from three inches to one foot at a pump rate of 400 gpm . . . ." At trial, Hyndman testified that, "in wetland 112, my expectation is that there will be a significant measurable drop that will be greater than three inches. That's based on, again, observations of data and the models that have been run by both myself and Dr. Andrews."[21] In Hyndman's May 2003 report, his model predicts a 0.7-foot drop in wetland 112, but Hyndman clarified that the predicted reductions in the wetlands "are expected to be larger than predicted by the present model because no model . . . can adequately describe the complex interactions between surface water and groundwater . . . ." Furthermore, after Hyndman was recalled, he noted that direct observation had already indicated that wetland 112 had dropped up to six inches as the result of pumping at rates significantly lower than 400 gpm, and so "the declines would be much more significant than shown here. So my opinion, based on everything I've seen with respect to 112, is 3 inches to even potentially greater than a foot in Wetland 112." Therefore, the trial court's finding that wetland 112 will drop from 3 to 12 inches is clearly supported by the record.

---

[21] Dr. Charles Andrews was defendant's groundwater expert.

For wetland 115, the trial court stated, "Dr. Hynd-man's opinion is that wetland 115 will suffer, hydrologically, a drop in water level of one and one half feet beyond natural cyclical effects at a pump rate of 400 gpm, and has already suffered losses at lower pump rates. I accept his opinion and adopt it." Hyndman testified at trial that wetland 115 would drop by more than one foot. Furthermore, his model predicted a drop of 1.9 to 2.2 feet. Given that Hyndman predicted a drop greater than one foot and that his model predicted a drop of up to 2.2 feet, the record adequately supports the trial court's findings for wetland 115.

For wetland 301, the trial court surveyed the evidence of a connection between wetland 301 and the groundwater and stated:

> Dr. Madsen[22] testified regarding her observation of 301 and estimated that it was down at the time of trial some three to six inches from last fall, a time frame in which she'd expect to see a rise in level, not a drop. She opined that two inches of drop had occurred within approximately two weeks of her observation from the nature of the exposed soils.
>
> * * *
>
> Wetland 301 is, thus, certain to have a drop at 400 gpm and appears to be having such at lower rates. Quantification of the drop on 301 is difficult. Dr. Madsen's observations noting a drop at pumping rates in the area of 160-200 gpm seem high, but do verify a drop at rates much below 400 gpm. Regarding the Defendants' motion to strike Dr. Madsen's opinions based on drawdowns in wetland 301 in the range of three to six inches (made during her testimony of June 6), that motion is denied as there is record evidence, including Dr. Madsen's observations, that, if

---

[22] Dr. Barbara Madsen was plaintiffs' expert in wetland ecology.

accepted, would indicate it may experience losses in that range.[23] The issue is left to be one of credibility and weight.

> Based on the above information I find that wetland 301 was experiencing drops in water level at the time of the trial in the range of two to four inches and that it will suffer a drop of twice that at the state permitted pump rate of 400 gpm.

From this it can be seen that the trial court took Madsen's direct observation of a drop in wetland 301 at approximately half the permitted pump rate, adjusted it downward on the basis of credibility assessments of her testimony, and then doubled it to reflect the permitted rate. Thus, the prediction for wetland 301 was based on a logical and reasonable analysis of the evidence presented at trial.

With regard to the Dead Stream wetlands, the trial court found:

> Frankly, little hydrologic evidence was received at trial regarding specific measurements regarding then existing or predicted drops in the water levels in the Dead Stream wetlands. Apparently everyone was relying on their predictions regarding the Dead Stream to carry over to the immediately adjacent wetlands. This is a reasonable assumption that I accept. Defendant argued that the absence of proofs directly relating to the Dead Stream wetlands means there are no proofs of such. To the contrary, Christopher Grobbel, one of Plaintiffs' experts in hydrology testified that a drop in the stream will result in a corresponding drop in the adjacent wetlands.[24] Further, Mark Luttenton[25] testified to his observation that the Dead Stream wetlands' water level dropped around three inches

---

[23] Defendant has not appealed the trial court's denial of the motion to strike.

[24] Grobbel testified that "if the Dead Stream were to drop 1 or 2 inches and stay there[,] . . . you'd see essentially a dewatering or a drying of wetlands contiguous to the Dead Stream."

[25] Dr. Luttenton was plaintiffs' expert in aquatic ecology and fisheries.

in the time between his visit on 1/6/2003 and 4/23/2003, a
time frame he'd expect to see an increase instead. Also[,]
Dr. Madsen testified that she observed a drop in water level
in these wetlands in the neighborhood of 4-6 inches from
10/02 and 5/03. Therefore, I find that the Dead Stream
wetlands will lose at least two inches of water level, and
maybe more, at a pump rate of 400 gpm, with lesser losses
at lower pump rates on a straight-[line] calculation.

Hence, the trial court's finding is based on a minimum
drop equal to that of the Dead Stream and possibly
more based on the direct observations of expert wit-
nesses. Therefore, the record also supports this finding.

### 2. DEAD STREAM

Defendant next contends that the trial court clearly
erred by finding that the Dead Stream would lose 345
gpm in flow and 2 inches in stage despite the fact that
Hyndman only predicted a drop in flow of 260 to 345
gpm and a drop in stage of 1 to 2 inches. In its opinion,
the trial court explained that the

Dead Stream will lose flow of 345 gpm at a pump rate of
400 gpm, a figure first calculated by Dr. Andrews and then
accepted by Dr. Hyndman. The defense made much over
the fact that this figure is different from, and greater than,
any loss calculated by Dr. Hyndman's models, a point
effectively replied to by Dr. Hyndman as he repeated that
his models were not designed to balance all elements of this
extremely complex ecosystem. His models were designed to
analyze components of the system with as few variables as
possible, which he satisfactorily explained as the best use of
models in situations such as this one, particularly when
much data is available. Dr. Hyndman accepted Dr. An-
drews' model's calculated loss of 345 gpm as such seemed
reasonable, a conclusion I agree with.

Although the trial court stated that it came "to the
generalized opinion that Dr. Hyndman's testimony and

opinions are more credible and supportable than those of Dr. Andrews," it also remarked that this general conclusion did not mean Hyndman was always correct or Andrews was always wrong. The trial court never excluded the possibility that it might rely on Andrews's testimony and models in making its findings.

At trial, Andrews testified that, at a steady-state pumping of 400 gpm, the Dead Stream would lose 345 gpm in flow. Furthermore, Hyndman testified that he and Andrews "agree that the majority of the flow that's being diverted as a result of the well would have gone to the Dead Stream system, and somewhere in the range of, we've talked about, 260 to 345 gallons a minute." Hyndman also explained that his models did not attempt to calculate the amount of flow diverted from the Dead Stream because he agreed with Andrews's determination that 345 gpm would be diverted. Hyndman clarified that "if 345 gallons per minute is diverted from Dead Stream as a result of pumping, then there will be roughly a two-inch drop based on its relationship, which is similar to what I've shown earlier." Therefore, the record supports the trial court's finding that the Dead Stream will lose 345 gpm in flow and that this loss will correspond to a drop of approximately 2 inches in stage.

Defendant also contends that the trial court's findings must be speculation because the trial court admitted that it was virtually impossible to analyze the effect on the Dead Stream of defendant's pumping. This statement was taken out of context. The trial court actually wrote, "[I]t is virtually impossible to get a reliable reading on the effects of Nestlé's operations on Dead Stream *on any given day*." (Emphasis added.) The trial court's statement does not stand for the proposition that no findings regarding the effect on the Dead Stream of defendant's pumping could be made. On the

contrary, both parties presented experts who were willing and able to offer expert opinions on the effects of defendant's pumping, and the trial court properly relied on those experts.

Defendant points to the trial court's finding that the Dead Stream's channel would narrow by more than four feet as the result of its pumping as an example of a failure in the trial court's reasoning that reveals its findings to be speculation. In making this finding, the trial court stated:

> Defendants' expert, David Cozad,[26] opined that the channel of Dead Stream will narrow one to two feet on each side of the channel (2'-4' total) over approximately ten years, if Dr. Andrews' opinions regarding decreases in Dead Stream flow and stage are accurate. I have found that Dr. Andrews' opinions on such are substantially below what has and will occur, so Cozad's opinion must be that even more channel-narrowing will occur. Plaintiffs' relevant expert, Mark Luttenton, opined that the channel narrowing will be to a greater degree than Cozad predicted and would occur over a longer period of time. He was not able to quantify how much more would occur than Cozad predicts, but is certain it will happen.
>
> I find that Nestlé's pumping operation will result in a narrowing of the channel of the Dead Stream over time in an amount greater than four feet.

Defendant's argument centers on the apparent inconsistency of accepting Andrews's determination that 345 gpm in flow will be lost and then rejecting Cozad's opinion, which was based on a loss of 345 gpm in flow, regarding the amount by which the channel of the Dead Stream would narrow. However, this argument ignores the fact that the trial court relied in part on Luttenton's opinion that Cozad understated the amount of channel

---

[26] Cozad was defendant's expert in aquatic ecology and fisheries biology.

narrowing without articulating an amount by which he believed the channel would narrow. The trial court accepted Luttenton's opinion that Cozad understated the amount, and so it was logical for the court to utilize Cozad's opinion as the base amount beyond which the channel would narrow. Furthermore, on cross-examination, Cozad admitted that keeping the 345-gpm flow reduction the same, but altering the average annual flow amount downward, would increase the amount of channel narrowing. The mere fact that the trial court adopted Andrews's diversion amount of 345 gpm does not mean that it also had to accept Andrews's assumptions about the average flow on the Dead Stream, which Cozad did when he rendered his original estimation of the amount the channel would narrow. Consequently, the record supported the trial court's finding that the channel would narrow by more than four feet.

### 3. HYDROLOGIC CONNECTION TO WETLAND 115

Defendant next finds fault with the trial court's finding that wetland 115 was affected by defendant's pumping. Defendant argues that it disproved plaintiffs' theory that wetland 115 had a hydrologic connection to the well field. Despite this, defendant contends, the trial court improperly developed its own unsupported theory that there was a hydrologic connection and used this theory in making its findings.

The trial court acknowledged that whether wetland 115 was affected by defendant's pumping was highly contested. Hyndman testified that there was a substantial connection between wetland 115 and the well field and opined that the water levels in wetland 115 correlated well with defendant's pumping activities. The trial court accepted Hyndman's opinion that wetland

115 would suffer a drop in water level as a result of defendant's pumping. The trial court also noted that Andrews admitted that wetland 115 would be affected by pumping to some small degree.[27] Finally, although the trial court did speculate about the possible explanations for the connection between wetland 115 and the well field, it also stated that "the mechanism for the effects to reach to these areas is not as important as the reality of it." Therefore, defendant's contention that the trial court impermissibly relied on its own unsupported theory is simply not an accurate reflection of the record or the trial court's opinion.

### 4. INCONSISTENT FACTS

Finally, defendant argues that the trial court illogically adopted inconsistent facts and accepted Hyndman's self-contradictory opinions over defendant's experts' opinions. In its opinion, the trial court unequivocally stated that it accepted Hyndman's opinion on the use and validity of groundwater models, while rejecting Andrews's opinion on the same thing. The court explained, "Dr. Hyndman's approach was not to try to model the entire system to get it to balance, but rather to take a more 'microanalysis' approach to examining components of the system to understand them. If there is sufficient 'hard' evidence, even Dr. Andrews agrees that is the best approach." At trial, Hyndman explained his approach to models:

> I believe the most powerful approach, most reliable approach, is to use the data that we have and evaluate what's occurring on the site.

---

[27] Andrews testified that his model showed some portion of wetlands 301, 112, and 115 would decline at a steady-state pumping rate of 400 gpm.

The models that I used were to evaluate hypotheses and see what types of effects are likely to be occurring in the groundwater system. And, I mean, models can be used for a variety of reasons. One can be there's insufficient data. Another can be you are trying to do a projection and you feel you don't have enough data to do so.

In this case, my view is that there's enough data to evaluate what's occurring in this system mainly using data.

The inconsistencies of which defendant complains are all based on differences in the variables used by Hyndman in his models. Yet Hyndman clarified several times that he used his models to check his hypotheses, but his opinions were based primarily on the data available. Taken in this context, defendant's argument is really an argument that the trial court should have disregarded Hyndman's testimony because the variables he used from one model to the next were inconsistent and, therefore, the conclusions he drew from those models must be unreliable. However, whether this use of models renders Hyndman's opinions suspect is a matter of weight and credibility properly left to the trial court, *McSwain, supra* at 683, and this Court will not second-guess the trial court's credibility determination in favor of Hyndman. MCR 2.613(C).

There were no factual errors warranting a new trial.

### C. MOTION TO REOPEN THE PROOFS

Defendant also argues the trial court erred by not permitting the reopening of proofs.[28] We disagree. When

---

[28] Because defendant's brief only presented arguments regarding the trial court's refusal to permit the reopening of proofs, we shall address only those arguments. Any remaining arguments made in the statement of questions presented or in the original motion were insufficiently briefed and, therefore, abandoned on appeal. *Van Tubbergen, supra* at 364-365.

evaluating whether the trial court abused its discretion on a motion to reopen proofs, this Court will consider (1) the timing of the motion, (2) whether the adverse party would be surprised, deceived, or disadvantaged by reopening the proofs, and (3) whether there would be inconvenience to the court, parties, or counsel. See *Bonner, supra* at 541.

In denying defendant's motion to reopen the proofs,[29] the trial court stated two main reasons: the need for finality in the presentation of evidence and the limited value of the data collected. The trial court recognized that, in a complicated environmental case, the reopening of the proofs to admit data would also necessitate testimony from the various experts regarding the proper interpretation of the data. Furthermore, because the data were continuously collected, by the time any new data were properly presented and interpreted, still more data would be available to the parties. Consequently, under defendant's theory, there was the potential for a never-ending cycle of data collection, presentation, and interpretation.

The trial court also recognized the limited probative value of the data from this isolated period, especially in the context of the data accumulated over the previous $2^{1/2}$ years. The trial court explained:

---

[29] Defendant actually made two motions to reopen the proofs. The first motion was made on September 2, 2003, after the close of proofs, but before closing arguments. This motion was heard on September 9, 2003, in a discussion on the record before closing arguments were made. Initially, the trial court had been inclined to permit the inclusion of the data, but the parties began to argue about the presentation and interpretation of the data, whereupon the trial court ruled that it would not consider data collected after the close of proofs, excepting data that the parties had already stipulated. The second motion was made as part of defendant's motion for a new trial and was addressed in the trial court's opinion of February 13, 2004.

The problem with this argument is that it places much weight on the information since trial, without putting it in the context of the data accumulations before and even during trial. Plaintiffs' reply, in part, that the heavy precipitation in November skews the presentation of data since trial, an argument that has merit . . . . The question is not merely what has happened since the proofs closed, but, rather, how does that new data "move" the existing data analysis in its totality one way or the other. The trial evidence clearly showed that it is important to look at as long a range of information as is available to "flatten the curve" of short-term anomalies, such as unusually high precipitation periods. Since Nestle has not shown how the overall analysis would be changed if the newly-accumulated data were incorporated into it, balancing it against the long-term assessment of the trial evidence, it has not proven that merely having new information would forward the controlling inquiries.

Because the trial court made its ruling on the basis of valid considerations of finality and the limited probative value of the data, we cannot conclude that the trial court was without justification or excuse in refusing to reopen the proofs. *McSwain, supra* at 685. Therefore, the trial court did not abuse its discretion.

### D. CONCLUSIONS

While one might disagree with the specific findings made by the trial court, they are adequately and plausibly supported by the testimony and documentary evidence in the record. *Beason, supra* at 803. Because the factual findings are supported in the record, we cannot say that we are left with the definite and firm conviction that the trial court made a mistake. *Alan Custom Homes, supra* at 512. Likewise, given the limited value of the additional data and the inconvenience that further presentations of data would entail, the trial court did not abuse its discretion by refusing to reopen the proofs. Because the trial court did not clearly err in

making its findings and did not abuse its discretion in denying defendant's motion to reopen the proofs, a new trial is not warranted on these grounds.

### III. GROUNDWATER CLAIM

Defendant argues the trial court erred when it determined that defendant's pumping unlawfully interfered with plaintiffs' riparian rights to the Dead Stream[30] on the basis of a hybrid rule of its own making rather than the balancing test stated in 4 Restatement Torts, 2d, § 858, p 258, which, defendant contends, was adopted in *Maerz v United States Steel Corp*, 116 Mich App 710; 323 NW2d 524 (1982). While we disagree with defendant's contention that *Maerz* made a wholesale adoption of the Restatement's rule, we also reject the trial court's hybrid rule as contrary to the principles established by Michigan authorities dealing with competing water uses. Instead, we find that these authorities establish a reasonable use balancing test similar to the Restatement's rule.

### A. STANDARD OF REVIEW

This Court reviews de novo, as a question of law, the proper scope and application of the common law. *People v Petty*, 469 Mich 108, 113; 665 NW2d 443 (2003).

### B. MICHIGAN WATER LAW

In order to provide some much-needed perspective on the applicable law, we shall engage in a discussion of the

---

[30] As already noted, the trial court determined that plaintiffs' claims against defendant were not based on a strict application of riparian law and, consequently, dismissed plaintiffs' riparian law claim (count II). Plaintiffs have not appealed that dismissal. However, the trial court did state that riparian principles may apply to plaintiffs' groundwater claim. See n 13 of this opinion.

doctrines historically applied to water disputes and trace the origin and development of water law in Michigan. Traditionally, water law has developed along two distinct lines: (1) the law applicable to water use by riparian owners and (2) the law applicable to groundwater uses.

### 1. RIPARIAN WATER RIGHTS

Under the common law, three main doctrines have developed for dealing with riparian water rights: the English common-law rule, also known as the natural flow doctrine; the reasonable use doctrine; and the appropriation or prior use doctrine. Stoebuck & Whitman, The Law of Property (3d ed), § 7.4, pp 422-425. Of these doctrines, the natural flow doctrine and the reasonable use doctrine are relevant to the development of water law in Michigan.[31]

Under the natural flow doctrine, each riparian proprietor of a watercourse has a right "to have the body of water flow as it was wont to flow in nature," qualified only by the right of other riparian proprietors to make limited use of the water. Restatement, introductory note to §§ 850 to 857, p 210.

> The doctrine permits every owner to consume as much water as needed for "domestic" purposes, which generally means for personal human consumption, drinking, bathing, etc., and for watering domestic animals. Beyond this, the owner may use the water for "reasonable" artificial or commercial purposes, subject to the very large proviso that he may not substantially or materially diminish the quan-

---

[31] The statutory appropriation or prior use doctrine prevails in arid states. Under this doctrine, one who makes prior use of water for some "beneficial" purpose, even if not a riparian owner, may gain the right to continue doing so. Stoebuck & Whitman, p 424; see also Restatement, introductory note to §§ 850 to 857, pp 213-214.

tity or quality of water. Certainly no water may be transported to land beyond the riparian land. [Stoebuck & Whitman, p 422.]

Under the reasonable use doctrine, "a riparian owner may make any and all reasonable uses of the water, as long [as] they do not unreasonably interfere with the other riparian owners' opportunity for reasonable use." *Id.* at 423. "Whether and to what extent a given use shall be allowed under the reasonable use doctrine depends upon the weighing of factors on the would-be user's side and balancing them against similar factors on the side of other riparian owners. No list of factors is exhaustive, because the court will consider all the circumstances that are relevant in a given case." *Id.* While in theory no single factor is conclusive, "[d]omestic uses are so favored that they will generally prevail over other uses." *Id.* Furthermore, while the reasonable use doctrine generally allows water to be transported and used on nonriparian lands, such uses may be disfavored over uses on riparian land. *Id.* at 424; see also Restatement, introductory note to §§ 850 to 857, pp 211-212.

In *Dumont v Kellogg*, 29 Mich 420 (1874), our Supreme Court adopted the reasonable use doctrine for competing riparian owners. The plaintiff in *Dumont*, a mill proprietor downstream from the defendant's mill, had filed suit complaining that the defendant had unlawfully interfered with his riparian rights by diminishing the flow of water to the stream below. *Id.* at 420. The plaintiff prevailed in the lower court, and the defendant appealed, assigning error to the jury instructions.[32] *Id.* at 421. In reviewing the instructions pre-

---

[32] The jury instructions summarized the law as preventing the defendant from materially diminishing the natural flow of the stream. *Dumont, supra* at 421.

sented to the jury, the Court rejected the notion that prior appropriation gave the plaintiff any superior rights to the stream. *Id.* at 422. The Court also stated:

> And in considering the case it may be remarked at the outset that it differs essentially from a case in which a stream has been diverted from its natural course and turned away from a proprietor below. No person has a right to cause such a diversion, and it is wholly a wrongful act, for which an action will lie without proof of special damage. It differs, also, from the case of an interference by a stranger, who, by any means, or for any cause, diminishes the flow of the waters; for this also is wholly wrongful, and no question of the reasonableness of his action in causing the diminution can possibly arise. And had the instructions which are excepted to been given with reference to a case of diversion, or of obstruction by a stranger, the broad terms in which the responsibility of defendant was laid down to the jury might have found abundant justification in the authorities. [*Id.*]

Thus, the Court determined that the jury instructions, which followed the natural flow rule, would have been applicable had the interference been caused by a stranger.[33]

---

[33] This bifurcation of the applicable rule, depending on the status of the party interfering with the riparian owner's water use, is not without precedent. See 4 Restatement Torts, 2d, Appendix (1982), § 850, pp 23-24; *Bollinger v Henry*, 375 SW2d 161 (Mo, 1964); *Pabst v Finmand*, 190 Cal 124, 132; 211 P 11 (1922) ("Obviously, there is no question of reasonable use in the sense in which that term is applied to the rights of respective riparian owners, since a riparian owner, as against a nonriparian owner, is entitled to the full flow of the stream without the slightest diminution."). However, the *Dumont* Court's use of the word "stranger" suggests that the Court was referring to a nonriparian who attempted to exercise riparian water rights. This understanding is consistent with the Restatement's approach, which recognizes that a nonriparian who uses the water of a watercourse or lake is liable for interference caused to a riparian owner by such use without reference to the reasonableness of the use. See Restatement, § 857, p 250.

After discussing the exceptions in which the natural flow rule might still apply, the Court went on to hold that, as between two riparian owners, the natural flow rule did not strictly apply because "it is manifest it would give to the lower proprietor superior advantages over the upper, and in many cases give him in effect a monopoly of the stream." *Id.* The Court concluded:

> It is therefore not a diminution in the quantity of the water alone, or an alteration in its flow, or either or both of these circumstances combined with injury, that will give a right of action, if in view of all the circumstances, and having regard to equality of right in others, that which has been done and which causes injury is not unreasonable. In other words, the injury that is incidental to a reasonable enjoyment of the common right can demand no redress. [*Id.* at 425.]

Because the instructions did not properly state the reasonable use rule applicable to competing riparian owners, the Court reversed the judgment and ordered a new trial. *Id.* at 425-426.

What constitutes a reasonable use must be determined on a case-by-case basis. *People v Hulbert*, 131 Mich 156, 170; 91 NW 211 (1902). However, diversions of water from a lake or stream that do not benefit riparian lands were generally considered unreasonable per se.[34] In addition, natural water uses are preferred

---

[34] See *Hall v City of Ionia*, 38 Mich 493, 500 (1878) ("We think the complainant has a right to an injunction against the threatened proceedings of defendants to collect and divert the water to purposes foreign to their use and enjoyment of the woolen factory premises, and that the prayer of the bill to that effect should have been granted."); *Stock v City of Hillsdale*, 155 Mich 375; 119 NW 435 (1909) (refusing to restrain the defendant's withdrawals from lake because the defendant proceeded in defiance of the plaintiff's rights for more than 20 years); *Kennedy v Niles Water Supply Co*, 173 Mich 474, 475-477; 139 NW 241 (1913) (noting that the defendant's withdrawal of water to supply the city of Niles would be impermissible if it were not for the prescriptive rights obtained by the

over artificial uses. *Thompson v Enz*, 379 Mich 667, 686; 154 NW2d 473 (1967) (plurality opinion of KAVANAGH, J.). Hence, under Michigan's riparian authorities, water disputes between riparian proprietors are resolved by a reasonable use test that balances competing water uses to determine whether one riparian proprietor's water use, which interferes with another's use, is unreasonable under the circumstances.

### 2. GROUNDWATER WATER LAW

As with riparian water law, there are three main common-law doctrines applicable to groundwater disputes. Stoebuck & Whitman, § 7.5, p 427.[35] The first doctrine is referred to as the English rule or the absolute ownership rule, which was first stated in *Acton v Blundell*, 12 Mees & W 324; 152 Eng Rep 1223 (Exch, 1843). Stoebuck & Whitman, pp 427-428. Under this rule, "a possessor of land may withdraw as much underground water as he wishes, for whatever purposes he wishes, and let his neighbors look elsewhere than the law for relief." *Id.* at 428.[36]

In America, the most prevalent rule applicable to groundwater disputes is the doctrine of reasonable use,

---

defendant); *Hoover v Crane*, 362 Mich 36, 42; 106 NW2d 563 (1960) ("Both resort use and agricultural use of the lake are entirely legitimate purposes. Neither serves to remove water from the watershed."); *Thompson v Enz*, 379 Mich 667, 686-687; 154 NW2d 473 (1967) (opinion of KAVANAGH, J.) ("Use for an artificial purpose must be (a) only for the benefit of the riparian land and (b) reasonable in light of the correlative rights of the other proprietors.").

[35] Under traditional principles of groundwater law, if the underground water flows in a defined underground stream, that water will be subject to the rules applicable to interference with riparian water rights. Stoebuck & Whitman, p 427; Restatement, introductory note to §§ 858 to 863, p 257.

[36] The absolute ownership rule is still the law in a minority of states. See *Sipriano v Great Spring Waters of America, Inc*, 1 SW3d 75 (Tex, 1999); *Maddocks v Giles*, 728 A2d 150, 153 (Me, 1999).

which is also called the American doctrine or the doctrine of correlative rights. *Id.* However, the doctrine of reasonable use is not actually dependent on the reasonableness of the use; rather,

> [a]s the doctrine has developed, it generally has been held that all uses of water upon the land from which it is extracted are "reasonable," even if they more or less deplete the supply to the harm of neighbors, unless the purpose is malicious or the water simply wasted. But . . . when the question is whether water may be transported off that land for use elsewhere, this is usually found "unreasonable," though it has sometimes been permitted. Authorities are not all agreed, but a principle that seems to harmonize the decisions is that water may be extracted for use elsewhere only up to the point that it begins to injure owners within the aquifer. [*Id.* at 428-429.]

The last doctrine is a variant of the reasonable use doctrine developed in California, which is often called the correlative rights doctrine. Stoebuck & Whitman, p 429. Under this doctrine,

> [o]wners of land within an aquifer are viewed as having equal rights to put the water to beneficial uses upon those lands. However, an owner's rights do not extend to depleting his neighbor's supply, at least not seriously so, for in the event of a water shortage, a court may apportion the supply that is available among all the owners. It is sometimes said that this is the application of the reasonable use doctrine of flowing streams to underground water. . . . As to uses outside the land from which the water is drawn, for municipal and other uses, the rule is similar to that under the ordinary reasonable use doctrine: water may be transported only if the overlying owners have been fully supplied. [*Id.*]

#### a. *SCHENK*

The seminal case dealing with groundwater rights in Michigan is *Schenk v City of Ann Arbor*, 196 Mich 75;

163 NW 109 (1917).[37] In *Schenk*, the city of Ann Arbor purchased land outside the city on which it planned to build a pumping station, and began pumping tests that drew approximately 3.8 million gallons of water daily for several weeks. *Id.* at 77-78. Numerous persons commenced actions seeking to restrain the city from pumping, including the plaintiff, because of harms allegedly caused by the pumping. *Id.* at 78-80. However, because the plaintiff in *Schenk* had successfully restored his water supply by lowering his well three feet, the trial court denied the plaintiff's request for an injunction, but granted damages for the actual harm already suffered. *Id.* at 80.

Before making its decision, the Court noted that the parties were not riparian owners and that the underground waters were percolating waters rather than waters running in a defined underground channel. The Court also noted that the city planned to pipe the water away from the lands from which it was drawn. *Id.* at 81. The Court then recited the rule of absolute ownership and the authorities for that rule, stating, "While this is the rule applied, and to be applied, in respect to most of the ordinary uses of land, and the ordinary operations carried on upon and in land, there is other doctrine, apparently, but not strictly, a modification of the early common-law doctrine referred to, which is sometimes called the doctrine of reasonable user, and which was introduced by equity to the law." *Id.* at 82. The Court then adopted the "rule of reasonable user" for the

---

[37] Before *Schenk*, Michigan might have followed the English rule of absolute capture. See *Upjohn v Richland Twp Bd of Health*, 46 Mich 542, 549; 9 NW 845 (1881) (noting that "the rule of law has become established that owners of the soil have no rights in sub-surface waters . . . as against their neighbors who may withdraw them by wells or other excavations").

reasons stated by the court in *Meeker v City of East Orange*, 77 NJL 623, 636-639; 74 A 379 (NJ, 1909). *Schenk, supra* at 82-84.

> "This [rule] does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation, or otherwise, nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring properties may thus be interfered with or diverted; but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it results therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses." [*Id.* at 84, quoting *Meeker, supra* at 638-639.][38]

Although the city was extracting the water for use off the property from which it was extracted, and therefore was subject to the limitations of the reasonable use rule, the Court determined that the plaintiff was not entitled to an injunction because he had lowered his well and regained a supply of water and no other harm was demonstrated entitling him to equitable relief. However, the Court left open the possibility of a future injunction based on a new harm. *Id.* at 92. Thus, the Court adopted the traditional reasonable use rule, which permits withdrawals of water whose use is not connected with the land from which it is withdrawn,

---

[38] The language quoted from *Meeker* suggests that the reasonable use rule would apply to groundwater users whose use interfered with riparian water rights. This is consistent with the application of the reasonable use rule in some jurisdictions. See Anno: *Subterranean and percolating waters; springs; wells*, 55 ALR 1385, 1418-1420.

but only to the extent that they do not interfere with an adjacent water user's reasonable use. *Id.* at 84.

### b. POST-*SCHENK* DECISIONS

After *Schenk*, Michigan courts continued to apply the reasonable use rule stated in *Schenk*, but applied it in a flexible manner to ensure that no one user would be deprived of all beneficial use of its water resources.

In *Bernard v City of St Louis*, 220 Mich 159; 189 NW 891 (1922), our Supreme Court was again confronted with a large municipal water user whose extraction of groundwater for use off-tract impaired a local user's groundwater use. The plaintiffs owned a hotel that was used as a sanitarium. The hotel property had a mineral spring whose waters were pumped to the roof of the hotel for storage and eventual distribution to the guests and patients of the hotel. *Id.* at 160-161. The defendant owned land adjacent to the hotel on which it had sunk five wells to service the water needs of its citizens. *Id.* at 161. When the defendant resumed using the wells after a period of disuse, the plaintiffs sued for and received an injunction barring the defendant's use of the wells to the extent that the use diminished the flow or pressure of the water flowing from the plaintiffs' well. *Id.* at 161-162. In deciding whether the injunction was appropriately granted, our Supreme Court stated:

> We are not satisfied, however, that if the city makes reasonable use of the percolating waters and the plaintiffs do not permit it to go to waste that there will not nearly all of the time be an ample supply for the needs of both. If there should not be then the plaintiffs should not be deprived of a supply of water sufficient for their reasonable use without compensation, nor should they be required to install new machinery without compensation. [*Id.* at 163.]

The Court approvingly cited *Schenk* and determined that the defendant should not be enjoined from all use of the wells, but should only be required "not to interfere with an adequate supply of water for the plaintiffs' reasonable use . . . ." *Id.* at 165. In addition, the Court modified the decree to require the defendant to compensate the plaintiffs for any machinery or appliances that the plaintiffs might have to install to maintain an adequate supply of water. *Id.*

While the *Bernard* Court did not state that it was employing a balancing test, its approach to solving the water dispute before it bears the hallmarks of a balancing test. The Court explicitly rejected an outright injunction against the defendant's off-tract water use simply because it diminished the flow and pressure of the plaintiffs' wells. Instead, the Court ensured that both parties would be able to utilize the water supply by compelling the defendant to limit its pumping activities to a level that did not interfere with an adequate supply of water for the plaintiffs' reasonable use. Notably, the Court did not attempt to protect the plaintiffs' water supply as it existed before the defendant began pumping, but only protected the plaintiffs' *adequate* supply of water and then only to the extent that the use was itself reasonable. The Court also determined that the defendant ought to compensate the plaintiff for any expenses incurred to maintain an adequate supply. Although still protecting on-tract uses over off-tract uses, the Court actually struck a balance between the two uses that attempted to ensure that both parties would have reasonable access to the common water supply.

In *Hart v D'Agostini*, 7 Mich App 319; 151 NW2d 826 (1967), the Court continued the trend toward applying a balancing test to groundwater disputes rather than strictly applying the traditional reasonable use rule.

The plaintiffs complained that the defendants interfered with their groundwater supply when they pumped water out of a construction zone while laying a sewer. *Id.* at 321. In examining the applicable rule, the Court stated, "The liability for interference with the subterranean water supply of a neighbor has been expressed, depending upon whether the causative activity (1) if intentional, was unreasonable, or (2) if unintentional, was negligent." *Id.* at 322, citing 4 Restatement Torts, § 822, p 226. After determining that the defendants' actions were intentional, the Court turned to *Schenk* and *Bernard* for guidance. "Both cases involved a public water company intentionally removing water from the subterranean supply and transporting it elsewhere for consumption, and in both cases it was held that such removal of the water . . . was an unreasonable use of the specific land and unreasonable as to the surrounding lands." *Hart, supra* at 322. The Court quoted the section of the *Schenk* case that quoted *Meeker* and stood for the proposition that the reasonable use rule does not impose liability when the interference is based on groundwater use in connection with the land from which the extraction occurred or caused by the reasonable development of that land. *Id.* at 322-323. The *Hart* Court then noted that the defendants' excavations did not involve the transport of water to distant lands for consumption, did not cause permanent damage, involved the reasonable development of a public easement, and benefited the surrounding homes. From this, the *Hart* Court concluded that the defendants' interference with the plaintiffs' water supply was not unreasonable and, therefore, reversed the trial court's ruling in favor of the plaintiffs. *Id.* at 323. Although the *Hart* Court could have applied the strict English rule to the facts before it, which *Schenk* implied was still applicable to disputes involving two on-tract groundwater users,

the Court instead examined the relevant factors and determined whether the defendants' use was reasonable in light of those factors and the harm caused.

This shift from the strict application of the reasonable use rule, which preserves the English rule for on-tract water disputes, to a balancing approach was explicitly endorsed by the Court in *Maerz*. In *Maerz*, the Court was presented with a case involving two competing groundwater users. The plaintiffs filed a complaint against the defendant quarry alleging that the defendant's dewatering of the quarry caused the loss of the plaintiffs' groundwater supply. *Maerz, supra* at 712. The issue before the Court was whether the defendant's use of the groundwater in connection with the property from which it was extracted (i.e., on-tract) was reasonable per se. *Id.* at 713. In attempting to ascertain the applicable standard, the *Maerz* Court surveyed the development of groundwater law in America beginning with the English rule of *Acton*, but noted that most American courts had rejected this rule in favor of modified versions. *Id.* at 713-714. The *Maerz* Court then discussed what it called the "correlative rights" rule, which it stated was adopted by the American Law Institute, as set forth in 4 Restatement Torts, 2d, § 858. *Id.* at 714-715.[39] "Under this rule a landowner is unrestricted in his right to extract underground waters from his property up to, but not beyond, the point the exercise of such right unreasonably interferes with the similar, or correlative right, of his neighbor." *Id.* at 714.

---

[39] While the *Maerz* Court correctly summarized the Restatement's approach, the characterization of the Restatement's rule as a correlative rights rule is unfortunate. As noted above, the phrase "correlative rights" has been used to describe both the American or reasonable use doctrine and the California modification of that doctrine, but neither doctrine employs a strict balancing test. See Restatement, §§ 850A and 858(2), pp 220, 258.

The *Maerz* Court then noted that there was also a reasonable use rule, which retained the English rule for water extraction used on the land from which it is extracted but employed a correlative rights rule for water used on distant lands. *Id.* at 715.[40]

After this survey, the *Maerz* Court analyzed the decision in *Schenk.* The *Maerz* Court concluded that the *Schenk* Court adopted a correlative rights balancing test for groundwater extraction used on distant lands. The *Maerz* Court also disregarded as dicta the *Schenk* Court's determination that the English rule governed extractions used in connection with the land from which it was extracted. *Id.* at 717. The *Maerz* Court then analyzed the progeny of *Meeker*[41] and *Bernard* and *Hart,* after which it concluded that "our analysis of these cases leads us to conclude that they do not establish as the law of Michigan that extraction of underground water for a purpose connected with the land from which it is withdrawn is, per se, not actionable." *Id.* at 720. The Court continued, "We further hold that the principles expressed in Restatement Torts, 2d, § 858, p 258 are consistent with the Michigan adjudications on the subject and the general trend of decisions in other states, are less harsh and arbitrary and more fair and just than the English rule or lesser modifications of the English rule, and should be followed in Michigan." *Id.*

---

[40] This is a mischaracterization of the traditional reasonable use doctrine. This doctrine does not employ a balancing test for water used on land other than the land from which the water was extracted. Instead, it permits water extraction for use off-tract up to the point at which it interferes with the groundwater rights of adjacent water users. Stoebuck & Whitman, pp 428-429.

[41] The *Maerz* Court examined the progeny of *Meeker* in an effort to demonstrate that the *Meeker* Court's holding adopted a reasonable use rule similar to the Restatement's approach for both on-tract and off-tract groundwater use. *Maerz, supra* at 718.

The *Maerz* Court explicitly rejected the traditional reasonable use rule and the English rule as the law applicable to groundwater disputes in Michigan. Instead, it determined that Michigan precedents had departed from the strict application of those rules in favor of a balancing approach to the resolution of groundwater disputes. On the basis of this, the *Maerz* Court reversed the trial court's determination that the extraction of groundwater in connection with the land is not actionable per se. *Id.*

### 3. CONCLUSION

We agree with the *Maerz* Court's conclusion that a reasonable use balancing test is consistent with the Michigan authorities governing water use.[42] Beginning with *Dumont* and *Schenk* and concluding with *Maerz*, Michigan courts have consistently avoided strict rules that permit one water user to utilize water at the expense of an adjacent user. Instead, while employing various tests, the courts have generally sought to ensure the greatest possible access to water resources for all users while protecting certain traditional water uses. See *Dumont, supra* at 423-425. Michigan courts have already recognized the value of the reasonable use balancing test for that purpose. See *Maerz, supra* at 717-720; *Hart, supra* at 322-323; *Dumont, supra* at 423-425. Consequently, in order to recognize the interconnected nature of water sources and fully integrate

---

[42] However, we do not agree with defendant's contention that the *Maerz* Court intended to make a sweeping adoption of the entire Restatement approach to the resolution of water disputes. Instead, we note that the *Maerz* Court only held that "the *principles* expressed in the Restatement . . . should be followed in Michigan." *Maerz, supra* at 720 (emphasis added). Even if the *Maerz* Court had made a sweeping adoption of the Restatement's rule, we would reject it as not binding. See MCR 7.215(J)(1).

the law applicable to water disputes, we adopt the reasonable use balancing test first stated in *Dumont* as the law applicable to disputes between riparian and groundwater users.

### C. APPLICATION OF THE LAW

In its opinion and order, the trial court applied a hybrid rule of its own making to plaintiffs' groundwater claim.[43] This hybrid rule is not consistent with the reasonable use balancing test we have determined to be applicable to this case. Therefore, the trial court erred in applying it. However, although the trial court applied the wrong law to the facts of this case, because the record on appeal and the trial court's findings are sufficient for our determination of this issue, we shall proceed to apply the balancing test to the facts of this case. See, e.g., *Thompson, supra* at 688 (declining to decide the issue because the record was insufficient to determine the reasonableness of the use); *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 754; 275 NW2d 538 (1979) (declining to remand because the record was sufficient to decide whether the predecessor of MEPA had been violated).

---

[43] The trial court stated its rule as follows:

In cases where there is a groundwater use that is from a water source underground that is shown to have a hydrological connection to a surface water body to which riparian rights attach, the groundwater use is of inferior legal standing than the riparian rights. In such cases, as here, if the groundwater use is off-tract and/or out of the relevant watershed, that use cannot reduce the natural flow to the riparian body. . . . The next step in the rule is in cases where, again as here, the groundwater use is shown to have measurable and proven negative impacts on the riparian body/bodies, with the analysis not having any component regarding whether the use is off-tract/out of watershed.

### 1. THE REASONABLE USE BALANCING TEST

The Court in *Hart, supra* at 321, observed that "[i]n our increasingly complex and crowded society, people of necessity interfere with each other to a greater or lesser extent." For this reason, the "right to [the] enjoyment of . . . water . . . cannot be stated in the terms of an absolute right." *Id.* The reasonable use balancing test is best adapted to this reality. It recognizes that virtually every water use will have some adverse effect on the availability of this common resource. For this reason, it is not merely whether one suffers harm by a neighbor's water use, nor whether the quantity of water available is diminished, "but whether under all the circumstances of the case the use of the water by one is reasonable and consistent with a correspondent enjoyment of right by the other." *Dumont, supra* at 424.

While the balancing test is a case-specific inquiry, there are three underlying principles that govern the process of balancing competing water uses. First, the law seeks to ensure a "fair participation" in the use of water for the greatest number of users. *Id.* Hence, the court should attempt to strike a proper balance between protecting the rights of the complaining party and preserving as many beneficial uses of the common resource as is feasible under the circumstances. Second, the law will only protect a use that is itself reasonable. *Hulbert, supra* at 173 (protecting "reasonable and ordinary" uses); *Dumont, supra* at 424-425; *Bernard, supra* at 165 (protecting "an adequate supply of water for the plaintiffs' reasonable use"). A plaintiff whose water use has little value or is excessive or harmful will be entitled to no protection. Third, the law will not redress every harm, no matter how small, but will only redress unreasonable harms. *Dumont, supra* at 424-425;

*Thompson, supra* at 688. Therefore, a plaintiff must be able to demonstrate not only that the defendant's use of the water has interfered with the plaintiff's own reasonable use,[44] but also that the interference was substantial.[45]

Having noted these underlying principles, we now turn to the factors to be balanced when determining whether the harm caused by the defendant's use is unreasonable under the circumstances. In *Hulbert,* the Court stated:

> "No statement can be made as to what is such reasonable use which will, without variation or qualification, apply to the facts of every case. But in determining whether a use is reasonable we must consider what the use is for; its extent, duration, necessity, and its application; the nature and size of the stream, and the several uses to which it is put; the extent of the injury to the one proprietor and of the benefit to the other; and all other facts which may bear upon the reasonableness of the use." [*Hulbert, supra* at 170, quoting *Gehlen Bros v Knorr,* 101 Iowa 700, 705; 70 NW 757 (1897).]

In *Thompson, supra* at 688, a plurality of the Court determined that the trial court should have applied a reasonable use balancing test to determine whether the defendant's proposed use of the lake was reasonable under the circumstances. Because the trial court did not make the necessary findings, the Court remanded the case, with the following guidance on the factors to be considered:

---

[44] If one proprietor makes no use of the water, that proprietor may not complain of another's otherwise lawful water use. See *Stock, supra* at 382. However, the value conferred by a stream or lake on riparian land is a use that courts will protect. See Restatement, § 850, comment b, pp 217-218.

[45] See also Restatement, § 850A, comment g, pp 226-227.

First, attention should be given to the water course and
its attributes, including its size, character and natural
state. In determining the reasonableness of the use in the
case at bar, it should be considered that Gun lake is not a
large lake, that it is used primarily for recreational pur-
poses, and that the defendants are changing its natural
state . . . .

Second, the trial court should examine the use itself as
to its type, extent, necessity, effect on the quantity, quality,
and level of the water, and the purposes of the users. . . .

Third, it is necessary to examine the proposed artificial
use in relation to the consequential effects, including the
benefits obtained and the detriment suffered, on the cor-
relative rights and interests of other riparian proprietors
and also on the interests of the State, including fishing,
navigation, and conservation. [*Id.* at 688-689.]

While the nature of the balancing test requires that the
appropriate factors be ascertained on a case-by-case
basis, *Hulbert, supra* at 170, in examining *Hulbert* and
*Thompson*, several factors can be discerned that will be
relevant to every application of the test. These factors
include (1) the purpose of the use, (2) the suitability of
the use to the location, (3) the extent and amount of the
harm, (4) the benefits of the use, (5) the necessity of the
amount and manner of the water use, and (6) any other
factor that may bear on the reasonableness of the use.[46]

When determining the purpose of the use, the court
should consider whether the use is for an artificial or a
natural purpose and whether the use benefits the land
from which the water is extracted. Natural purposes
include all those uses necessary to the existence of the

---

[46] While these factors are drawn from Michigan authorities, we recog-
nize that the factors listed in Restatement, § 850A, p 220, have many
similarities. Because of these similarities, we shall resort to the Restate-
ment as an aid to understanding the role of these factors in the balancing
test.

user and his or her family, including the use of the water for drinking and household needs. *Thompson, supra* at 686.[47] "Artificial uses are those which merely increase one's comfort and prosperity and do not rank as essential to his existence, such as commercial profit and recreation." *Id.* Because "[u]sers for natural purposes enjoy a preferred nonproratable position with respect to all other users rather than a correlative one," if an artificial use interferes with a natural use, the natural use will prevail.[48] *Id.* Further, in order to ensure that the needs of local water users are met first, water uses that benefit the riparian land or the land from which the groundwater was removed are given preference over water uses that ship the water away or otherwise benefit land unconnected with the location from which the water was extracted. *Schenk, supra* at 84; *Thompson, supra* at 686-687.[49]

In assessing the suitability of the use to the location, the court should examine the nature of the water source and its attributes. *Hulbert, supra* at 170; *Thompson, supra* at 688. A particularly large aquifer, stream, or lake may be unaffected even by extensive water withdrawals, whereas a marginal water resource may be unduly strained even by relatively modest withdrawals. See Restatement, § 850A, comment d, pp 224-225. Likewise, the uses to which a particular water source is customarily put are relevant to a determination of whether a new use is suitable to the area. *Thompson,*

---

[47] See also Restatement, § 850A, comment b, pp 223.

[48] See also Restatement, § 850A, comment c, pp 223-224.

[49] While we acknowledge that, at least in the context of riparian rights, prior courts have determined that uses that did not benefit the riparian land were unreasonable per se, see n 34 of this opinion, we believe that such a per se rule is incompatible with modern use of the balancing test. Instead, we hold that the location of the use is but one of the factors that should be considered in balancing the relative interests.

*supra* at 688 (noting that the lake involved was primarily used for recreational purposes); Restatement, § 850A, comment d, p 225 ("The use must fit into the pattern of other uses so as to cause as little disruption as possible.").

In assessing the harm and benefits, the court should examine not only the economic harm and benefits to the parties, but should also examine the social benefits and costs of the use, such as its effect on fishing, navigation, and conservation. *Thompson, supra* at 689. Negative social effects should weigh against the use, see Restatement, § 850A, comment f, p 226, and positive social effects should weigh in favor of a determination of reasonableness, *Hart, supra* at 323 (noting that the sewer line benefited the area). The traditional use employed in the locality where the resource resides will often be a guide to what the community considers reasonable in this context. *Dumont, supra* at 425. Likewise, because society benefits from predictability, the protection of existing water uses should be an important consideration in the balancing of competing water uses. See *Hulbert, supra* at 165, quoting *Strobel v Kerr Salt Co*, 164 NY 303; 58 NE 142 (1900); Restatement, § 850A, comment k, pp 233-235.

The court should also examine the extent, duration, necessity, and application of the use, including any effects on the quantity, quality, and level of the water. *Hulbert, supra* at 170; *Thompson, supra* at 688-689.[50] If the amount or method of water use is excessive or unnecessary and harms another's use, it will be unreasonable. See Restatement, § 850A, comments h and i, pp 227-231. Furthermore, if the harm caused by a water use can be readily modified to mitigate or eliminate the

---

[50] Even extensive interruptions in a party's water supply may be reasonable under some circumstances. See *Hart, supra* at 323.

harm, the failure to take such steps may make the particular use unreasonable. See Restatement, § 850A, comment h, p 227. Finally, the court should consider any other factor relevant under the circumstances applicable to the case before it. *Hulbert, supra* at 170.

### 2. APPLICATION TO THE FACTS

In the present case, plaintiffs alleged that defendant's groundwater withdrawals interfered with their riparian rights in the Dead Stream,[51] including their right to utilize the stream for recreational boating, wildlife observation, swimming, and fishing, as well as diminishing the aesthetic value of their riparian lands. While some courts have questioned the reasonableness of recreational water uses such as these, see Restatement, § 850A, comment b, p 223, a plurality of our Supreme Court has determined that recreational uses, including the use of riparian waters as a restful retreat, constitute reasonable uses, *Thompson, supra* at 689. In addition, we recognize that individuals often seek out and invest in riparian property for aesthetic reasons even though they may not partake of recreational activities involving the physical use of the water.[52] Therefore, plaintiffs' use of the stream is a reasonable use worthy of protection.

It is also uncontested that defendant's use of the disputed water serves a beneficial purpose. Testimony established that defendant's bottling plant employed

---

[51] The trial court determined that, as a matter of law, plaintiffs' groundwater claim only applied to the effects on the Dead Stream that were caused by defendant's use. Because plaintiffs have not appealed this part of the trial court's ruling, we shall limit our analysis accordingly.

[52] See, e.g., *Bott v Natural Resources Comm*, 415 Mich 45, 78-79; 327 NW2d 838 (1982) (refusing to expand the definition of navigability because such an expansion would render riparian property unfit as a refuge or retreat and, therefore, diminish property values).

140 persons at the time of the trial. This employment directly benefits the workers, their families, and the local community. Likewise, defendant's plant and equipment represent a significant investment in the community and are a source of tax revenue. The provision of water to the general public is also an economically and socially beneficial use of the water. See Restatement, § 850A, comment f, p 226. Therefore, defendant's water use is not inherently unreasonable. Consequently, we must balance the relevant factors to determine whether defendant's use of the water is unreasonable under the circumstances and in light of the harm inflicted on plaintiffs.

Plaintiffs claim that defendant's water withdrawals will harm their recreational and aesthetic use of the Dead Stream, but provide no evidence that defendant's water use has interfered or will interfere with their domestic water supplies. Likewise, defendant's use of the water is for commercial profit. Therefore, both uses are for artificial purposes and neither is entitled to a preference. However, plaintiffs' uses are directly related to the use and enjoyment of their riparian land, whereas defendant's use is not directly related to the land from which the water is withdrawn. Hence, plaintiffs are entitled to some measure of preference as local water users.

All parties agreed that defendant's water withdrawals will capture water that would otherwise have entered the Dead Stream. Hence, defendant's water withdrawals will have a direct effect on the amount of flow in the Dead Stream. In describing the Dead Stream, the trial court noted that it was already a low-flow stream subject to many natural variables. For these reasons, the trial court found that even a modest drop in water level would have dramatic consequences for the stream.

Finally, the established uses for the Dead Stream and the lakes to which it connects have traditionally been recreational rather than commercial in character. Considering these factors together, we conclude that the Sanctuary Springs location, with its direct connection to the Dead Stream, is not well suited for high-volume water extractions. Hence, this factor weighs against defendant's use.

In examining the degree of harm to the Dead Stream, the trial court found that it would lose approximately 24 percent of its base flow[53] and 2 inches in stage beyond the stream's natural fluctuations given a withdrawal of 400 gpm. The trial court determined that this reduction in flow would raise the stream's temperature and cause the stream to become choked with plant life. The trial court further found that the loss of flow would cause a narrowing of the channel by at least four feet over a period of time. The trial court determined that these effects would impair the Dead Stream's aesthetic value and its usefulness as a fishery, and would impair recreational navigation of the stream. The loss of recreational use and the physical alteration of the Dead Stream will directly and substantially harm the riparian value of the Dead Stream. Furthermore, while these harms most directly affect those plaintiffs riparian to the Dead Stream, the loss of fishery habitat and recreational value also indirectly affects the quality of fishing and recreation in the entire Tri-lakes area.[54] On the other hand, defendant's bottling enterprise does have

---

[53] In its opinion of February 13, 2004, the trial court noted that the percentage of base flow reduction is probably closer to 24 percent than to the 29 percent listed in its original opinion.

[54] At trial, David Cozad, defendant's expert in aquatic ecology and fisheries biology, agreed that a majority of the shoreline in the Tri-lakes area was developed and that this made "all fish habitat associated with the littoral zone of importance."

significant commercial benefits. The plant directly employs 140 workers and indirectly benefits other workers who provide the plant with necessary goods and services. In addition, the plant provides increased tax revenues to the state and the local community through payroll and property taxes. Overall, under the facts of this case, the harms inflicted on the riparian plaintiffs and the community in general are significantly offset by the economic benefits to society and the local community. Hence, this factor does not favor any party.

In examining the necessity of the manner and amount of defendant's water use, it must be noted that defendant chose the Sanctuary Springs location in order to facilitate its marketing of the extracted water as "spring water."[55] Hence, defendant's options for locating its wells are limited by the nature of the required water source. However, while testimony established that any reduction in the withdrawal rate below 400 gpm will result in the loss of production and jobs,[56] testimony also established that defendant has augmented the supply of water at other plants by shipping it in as needed.[57] In addition, by the time of the trial, defendant had already begun to explore opportunities for obtaining suitable water from other sources.[58] Therefore, defendant does not need to maintain such a

---

[55] See n 4 of this opinion.

[56] Brendan O'Rourke, the plant manager of defendant's Mecosta County Ice Mountain bottling plant, testified that it takes about 50 gpm of water to run one production line and that each line is staffed by 16 employees. He further stated that, counting support staff, every 50 gpm represents about 20 employees.

[57] O'Rourke testified that defendant has curtailed production at its Pennsylvania plant to protect the spring site and shipped water in from Maryland during the period of reduced withdrawals.

[58] O'Rourke testified that defendant applied for permits and established monitoring wells at a spring water site in Osceola County.

high pumping volume at the Sanctuary Spring site in order to continue operations. In contrast, plaintiffs' water uses do not remove water from the system, but do require a minimum level of water, which cannot be mitigated through changes in the manner of use.[59] These factors weigh heavily against defendant's proposed pumping rate of 400 gpm.

### 3. CONCLUSION

Although defendant should be permitted to have a "fair participation" in the common water resources of the area, if defendant is permitted to pump at the maximum permitted rate, it will effectively appropriate for its own needs approximately 24 percent of the base flow of the Dead Stream. This is more than a fair participation. While plaintiffs might properly be required to suffer some harm to their use of the Dead Stream, it would be unjust to permit defendant to impose on plaintiffs the entire burden of the harms created by the depletion of the Dead Stream's flow while retaining all the benefits. Furthermore, because defendant is in the best position to spread the costs incurred by a reduction in its use of the water from Sanctuary Springs, it is just that it should bear a greater portion of that burden. See Restatement, § 850A(i), p 220. Therefore, taking all the factors outlined into consideration, we determine that defendant's proposed withdrawal of 400 gpm would be unreasonable under the circumstances.

---

[59] The Restatement recognizes that certain water uses, such as boating and recreation, as well as the maintenance of riparian property value, may require the court to protect the integrity of an entire stream or lake. However, such protection is limited to the amount of water needed to preserve the plaintiff's use or the values attributable to the water. Restatement, § 850A, comment i, p 231.

### D. REMEDY

Having determined that defendant's proposed withdrawal of water from Sanctuary Springs in the amount of 400 gpm will unreasonably interfere with plaintiffs' riparian water rights in the Dead Stream, we must now determine what the appropriate remedy is under the circumstances. Because of the unique nature of riparian rights, we conclude that an injunction of limited scope is the only adequate remedy.

Injunctive relief is an extraordinary remedy that will be granted only when (1) justice requires it, (2) there is no adequate remedy at law, and (3) there exists a real and imminent danger of irreparable injury. *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 106; 662 NW2d 387 (2003). In considering the propriety of an injunction, this Court will consider the following factors:

"(a) [T]he nature of the interest to be protected,

(b) the relative adequacy to the plaintiff of injunction and of other remedies,

(c) any unreasonable delay by the plaintiff in bringing suit,

(d) any related misconduct on the part of the plaintiff,

(e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,

(f) the interests of third persons and of the public, and

(g) the practicability of framing and enforcing the order or judgment." [*Id.*, quoting *Kernen v Homestead Dev Co*, 232 Mich App 503, 514-515; 591 NW2d 369 (1998).]

In the present case, plaintiffs will suffer substantial harm to their riparian rights if defendant's planned pumping rate of 400 gpm is permitted. In addition to the loss of recreational uses in the Dead Stream, there

will be lasting changes to the natural characteristics of the stream, which could significantly alter its riparian value. Plaintiffs also have no adequate remedy at law. Unlike the plaintiff in *Schenk*, plaintiffs cannot make physical improvements to their personal or real property that would ensure an adequate supply of water for their uses. In addition, plaintiffs have not suffered an ascertainable business loss for which compensation may be had, as was the case in *Monroe Carp Pond Co v River Raisin Paper Co*, 240 Mich 279, 289; 215 NW 325 (1927). Furthermore, because plaintiffs' riparian water rights are founded on property law, *Dyball v Lennox*, 260 Mich App 698, 705; 680 NW2d 522 (2004), an award of damages in gross for the complete loss of those rights is inappropriate. See *Hulbert, supra* at 166. Consequently, the only just way to prevent the harm is to enjoin defendant from withdrawing water from Sanctuary Springs to the extent that such withdrawals are inconsistent with plaintiffs' correspondent rights to make use of the same water resources.

While we have determined that defendant's proposed withdrawal rate of 400 gpm would be unreasonable in light of the factors analyzed, this does not necessarily mean that defendant should be completely enjoined from making use of its wells. On the contrary, as already noted, defendant is entitled to make reasonable use of the available water resources, and plaintiffs may properly be compelled to endure some measure of loss as long as an adequate supply of water remains for their own water uses. Having made this determination, we are now confronted with the daunting task of determining what level of water extraction from Sanctuary Springs will provide a fair participation in the common water supply for defendant, but leave plaintiffs with an adequate supply of water for their own water uses. While the trial court made findings of fact sufficient to

address whether a violation of plaintiffs' water rights would occur at a steady pumping rate of 400 gpm, the trial court did not directly address the level of water necessary to adequately maintain plaintiffs' current uses for the Dead Stream. Furthermore, at trial Hyndman testified that the adverse effects from defendant's pumping vary depending on the current level of flow and suggested that the remedy might have to be tied to these fluctuations.[60] Because of the paucity of findings directly on point and the complexity of the water system at issue, we are unable to determine on appeal what level of pumping from Sanctuary Springs is reasonable under the circumstances. Therefore, we must remand this issue for determination by the trial court.

On remand, the trial court shall hold a hearing to determine what level of water extraction from Sanctuary Springs will provide defendant with a fair participation in the common water supply while maintaining an adequate supply for plaintiffs' water uses. Because we have found no reason to question the validity of the findings of fact already made by the trial court, no new evidence shall be permitted at the hearing except as determined to be necessary by the trial court, and the trial court shall give due regard to the trial court's earlier findings and credibility assessments. At the hearing, the trial court shall hear the arguments of the parties and, on the basis of these arguments, the record evidence, and the trial court's earlier findings, determine what level of water extraction from Sanctuary Springs will meet the criteria discussed above. Once the

---

[60] At trial, Hyndman testified that there appears to be a 1500-gpm threshold level for the Dead Stream. Hyndman stated that the effect of defendant's pumping is less when the Dead Stream's flow is greater than 1500 gpm and is more significant when the flow drops below that level. He further testified that, when the Dead Stream's flow drops below 1250 to 1300 gpm, there are significant mudflat exposures.

trial court has made this determination, it shall enter an order modifying the previous injunction accordingly.

### E. CONCLUSION

Although the trial court erred when it applied the wrong law to plaintiffs' groundwater claim, it correctly determined that defendant's water withdrawals from Sanctuary Springs unlawfully interfered with plaintiffs' riparian water uses. This Court will uphold a trial court's ruling on appeal when the right result issued, albeit for the wrong reason. *Gleason v Dep't of Transportation*, 256 Mich App 1, 3; 662 NW2d 822 (2003). Therefore, we affirm the judgment in favor of plaintiffs on the groundwater claim, but remand to the trial court to determine the appropriate parameters of the injunction and modify it accordingly.

### IV. MEPA[61]

Defendant next argues that "[t]he trial court's MEPA holding suffers from numerous fundamental errors and should be reversed." Defendant contends that (1) plaintiffs lacked standing to bring a MEPA claim with respect to the Osprey Lake impoundment and wetlands 112, 115, and 301, (2) the trial court improperly utilized the inland lakes and streams act (ILSA)[62] and the wetlands protection act (WPA)[63] to establish per se violations of MEPA, (3) the trial court should have remanded the case to the DEQ, and (4) even under the facts found by the trial court, defendant's water with-

---

[61] The Michigan environmental protection act (MEPA), MCL 324.1701 *et seq.*, is part 17 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*

[62] ILSA is part 301 of the NREPA, MCL 324.30101 *et seq.*

[63] The WPA is part 303 of the NREPA, MCL 324.30301 *et seq.*

drawals do not constitute an impairment under MEPA. We agree that the trial court's MEPA holding must be reversed.

### A. STANDARDS OF REVIEW

This Court reviews de novo the trial court's conclusions of law. *Alan Custom Homes, supra* at 512. Statutory interpretation is also an issue of law that is reviewed de novo. *Shinholster v Annapolis Hosp*, 471 Mich 540, 548; 685 NW2d 275 (2004). Finally, whether a party has standing to assert a claim is a question of law. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 612; 684 NW2d 800 (2004).

### B. MEPA STANDING

Defendant first argues that plaintiffs lack standing to sue under MEPA for claims respecting the Osprey Lake impoundment and wetlands 112, 115, and 301 because any adverse effect on those areas from defendant's pumping activities does not affect plaintiffs in a manner different from the citizenry at large.[64] We agree.[65]

---

[64] On appeal, plaintiffs argue that defendant's failure to raise the issue of standing in their answers to plaintiffs' first amended complaint constitutes a waiver of this issue. However, both the Bollmans and defendant raised the issue of standing in their responsive pleadings. Therefore, plaintiffs' waiver argument is without merit.

[65] While the trial court did not directly address this issue, resolution of it is critical to plaintiffs' MEPA claims. Furthermore, because of our Supreme Court's decision in *Cleveland Cliffs*, which was released after the release of the trial court's original opinion in this matter, there is doubt about the continuing validity of the standing conferred by MCL 324.1701(1). For these reasons, we elect to consider this issue rather than remand it to the trial court. See *People v Smith*, 420 Mich 1, 11 n 3; 360 NW2d 841 (1984) (electing to address the issue of standing first raised on appeal because resolution of the standing question was necessary to a proper determination of the case and because of the confusion concerning the proper state of the rule of law).

In *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), our Supreme Court addressed the importance of standing under Michigan's constitutional scheme. The Court first examined standing under the federal system and noted that, "as a requirement to enter the courts, [standing] is a venerable doctrine in the federal system that derives from US Const, art III, § 1, which confers only 'judicial power' on the courts and from US Const, art III, § 2's limitation of the judicial power to 'Cases' and 'Controversies.' " *Id.* at 735. The Court stated that Michigan's standing doctrine "has developed on a track parallel to the federal doctrine, albeit by way of an additional constitutional underpinning." *Id.* at 737. The Court explained that, in addition to "Const 1963, art 6, § 1 which vests the state 'judicial power' in the courts, Const 1963, art 3, § 2 expressly directs that the powers of the legislature, the executive, and the judiciary be separate." *Id.* Hence, the Court in *Lee* identified the requirement that a litigant meet the test for standing with the proper exercise of the judicial power and the separation of powers mandated by Michigan's constitution.

After examining the constitutional underpinnings of Michigan's doctrine of standing, the Court adopted the test for standing stated in *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). To meet this test, the plaintiff must demonstrate three things:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some

third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " [*Lee, supra* at 739, quoting *Lujan, supra* at 560-561.]

In the present case, plaintiffs are property owners along the Dead Stream and Thompson Lake and a nonprofit organization dedicated to the conservation of water and the protection of riparian interests. While a nonprofit organization has standing "to bring suit in the interest of their members where such members would have standing as individual plaintiffs," *Cleveland Cliffs, supra* at 629, none of the members of the MCWC, including the Sapps and the Doyles, presented any evidence that they use the Osprey Lake impoundment or wetlands 112, 115, or 301 in any way.[66] Because plaintiffs do not use these areas, they cannot demonstrate that they have suffered or would suffer a concrete and particularized injury distinct from that of the public generally. *Id.* at 615. Hence, under the test stated in *Lee*, plaintiffs do not have standing to bring a suit based on harms to the Osprey Lake impoundment and wetlands 112, 115, and 301.

However, under MCL 324.1701(1), "any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." Because the plain language of this statute purports to grant *any person* standing to bring a claim under MEPA, we must determine whether the Legislature can confer standing broader than is required under *Lee*.

---

[66] These features are all on the Bollmans' private hunting reserve and, hence, are inaccessible to the general public.

In *Cleveland Cliffs*, the plaintiffs brought a MEPA claim seeking a preliminary injunction against the defendants' expansion of their mining operations. The lower court denied the injunction for a lack of standing, but the Court of Appeals reversed because MEPA permitted any person to bring suit. *Cleveland Cliffs, supra* at 611-612. Our Supreme Court granted leave to appeal to determine whether the Legislature can confer standing broader than the judicial test for standing. *Id.* at 612.

The majority in *Cleveland Cliffs* began its analysis by reiterating that proper standing is mandated by Michigan's constitutional separation of powers and reaffirmed its adherence to the principles stated in *Lee*. *Id.* The Court explained:

> Perhaps the most critical element of the "judicial power" has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute, and one in which the plaintiff has suffered a "particularized" or personal injury. Such a "particularized" injury has generally required that a plaintiff must have suffered an injury distinct from that of the public generally.
>
> Absent a "particularized" injury, there would be little that would stand in the way of the judicial branch becoming intertwined in every matter of public debate. [*Id.* at 615 (citations omitted).]

Furthermore, "[t]o allow the judiciary to carry out its responsibilities in this manner is to misperceive the 'judicial power,' and to establish the judicial branch as a forum for giving parties who were unsuccessful in the legislative and executive processes simply another chance to prevail." *Id.* at 615-616. Because the standing limitations are imposed by Michigan's constitution, "[w]hen a broadening and redefinition of the 'judicial power' comes not from the judiciary itself, usurping a

power that does not belong to it, but from the Legislature purporting to confer new powers upon the judiciary, the exercise of such power is no less improper." *Id.* at 616. Indeed, "[i]f the Legislature were permitted at its discretion to confer jurisdiction upon this Court unmoored from any genuine case or controversy, this Court would be transformed in character . . . ." *Id.* at 622. However, because the Court determined that plaintiffs had standing without regard to MCL 324.1701(1), it found it unnecessary to reach the constitutionality of that statute. *Cleveland Cliffs, supra* at 632.

Although the majority in *Cleveland Cliffs* declined to specifically examine the constitutionality of MCL 324.1701(1), it clearly determined that the Legislature was without the authority to expand standing beyond the limits imposed by Michigan's constitution. Because the Court in *Cleveland Cliffs* intentionally took up and discussed the Legislature's authority to confer broader standing, its decision on that matter is binding on this Court. *People v Higuera*, 244 Mich App 429, 437; 625 NW2d 444 (2001). Consequently, we must hold that, to the extent that it confers standing broader than the limits imposed by Michigan's constitution, as determined by *Lee* and *Cleveland Cliffs*, MCL 324.1701(1) is unconstitutional.[67] However, while plaintiffs lack standing to assert MEPA claims for the Osprey Lake impoundment and wetlands 112, 115, and 301, defendant has not contested plaintiffs' standing to assert MEPA claims for harms to Thompson Lake, the Dead Stream,

---

[67] We are cognizant that constitutional issues should not be addressed if the case may be decided on other grounds. *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001). However, the outcome of the MEPA analysis depends on whether the aggregate effect on all the affected wetlands of defendant's pumping may be considered as opposed to the effect on one wetland. Therefore, we must address the constitutionality of the Legislature's purported grant of expanded standing.

and the Dead Stream's wetlands. Therefore, we shall continue our review of the trial court's decision on plaintiffs' MEPA claims, but only to the extent that it applies to those areas.

### C. MEPA STANDARDS

We shall next address defendant's argument that the trial court improperly determined that defendant's water withdrawals violated ILSA and the WPA and, therefore, constituted a prima facie violation of MEPA.

### 1. ESTABLISHING A MEPA CLAIM

Under MEPA, a party may maintain an action against any person "for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." MCL 324.1701(1). To maintain the action, the plaintiff must first make out a prima facie case that the defendant has or is likely to pollute, impair, or destroy the air, water, or other natural resources. MCL 324.1703(1); *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 309; 224 NW2d 883 (1975). However, "MEPA does not impose specific requirements or standards; instead, it provides for de novo review in Michigan courts, allowing those courts to determine any adverse environmental effect and to take appropriate measures." *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 30; 576 NW2d 641 (1998). Therefore, it is the task of the trial court to develop the standards and find the facts on which the plaintiff claims to have made a prima facie case. *Ray, supra* at 309. Because MEPA does not have specific standards, the "judicial development of a common law of environmental quality, as envisioned by the Legislature, can only take place if circuit court judges

take care to set out with specificity the factual findings upon which they base their ultimate conclusions." *Id.* at 307.

Under MEPA, the trial court may also examine the validity, applicability, and reasonableness of a pollution control standard "fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state . . . ." MCL 324.1701(2). "Where the purpose of the statute used as a pollution control standard is to protect our natural resources or to prevent pollution and environmental degradation, a violation of such a statute can establish a prima facie case under the MEPA." *Nemeth, supra* at 36. Therefore, in determining that a plaintiff has made out a prima facie MEPA violation, the trial court may either (1) make detailed and specific findings that the defendant's conduct has polluted, impaired, or destroyed, or is likely to pollute, impair, or destroy, the air, water, or other natural resources, *Ray, supra* at 309-310, or (2) find that the defendant has violated an applicable pollution control standard, *Preserve the Dunes, Inc v Dep't of Environmental Quality,* 471 Mich 508, 516; 684 NW2d 847 (2004).

Once a prima facie case is made out by the plaintiff, the burden of proceeding shifts to the defendant, who may rebut the prima facie case with evidence to the contrary. MCL 324.1703(1); *Ray, supra* at 310-311. Finally, the defendant may elect to present the affirmative defense that there "is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." MCL 324.1703(1); *Ray, supra* at 312-313.

### 2. PLAINTIFFS' PRIMA FACIE CASE

In its opinion, the trial court determined that plaintiffs had made out a prima facie MEPA claim. The trial court explained:

> After careful consideration of the issue, I believe [ILSA] presents an excellent standard for environmental protection, which neither the parties, the DEQ nor I can authorize activities contrary to. I adopt it as one of the MEPA standards applicable to this case.

> Inherent in the above discussion of [ILSA], I find that the Defendants were/are required to apply for a permit under [ILSA], a step they did not take. However, if they had, it is probable that the DEQ would have, improperly, issued one . . . . As such, it would be a meaningless act to order the Defendants to apply to the DEQ for an [ILSA] permit. Such finding sets out a *prima facie* case under MEPA that the Defendants have not rebutted, as spelled out in great detail in the factual-analysis portions of this opinion above. . . . Thus, the Defendants are in violation of the standard adopted herein, thus making them subject to appropriate remedies being ordered by this court in this case.

After examining ILSA, the trial court turned to the WPA.

> In going through the analysis set out in [the WPA], which I find to be an appropriate standard for the protection of the environment under MEPA, I also hereby find that the balancing of this particular use of groundwater in the form of spring water from this particular ecosystem, with the resulting effects and impacts set out in the factual analysis portion of this opinion, results in the conclusion that Nestlé's beverage bottle-water operation falls on the losing side of the balancing of the public interest in it, as compared to the price the wetlands here in contention are paying and will pay, considering all interests, including the public's, in these wetlands. As such, Plaintiffs are hereby found to have presented a *prima facie* case under MEPA using this WPA standard.

After examining ILSA and the WPA, the trial court examined the Great Lakes preservation act (GLPA),[68] and rejected it as a possible MEPA standard. Then, under the heading "Non-Statutory MEPA Standards/Concepts," the trial court suggested possible future changes in the legal framework applicable to a plaintiff's showing of a prima facie case and the balancing of interests under MEPA, but did not adopt a standard or make specific findings. The trial court then surveyed the options open to defendant and concluded that "Nestlé's pumping operations at the Sanctuary Springs violates a number of standards of environmental protection" and that "it is my decision that injunctive relief against all pumping operations at that site is appropriate, and such an order is hereby issued."

At no point in its discussion of MEPA did the trial court make specific findings, as required by *Ray, supra* at 309-310, that defendant's conduct had or was likely to pollute, impair, or destroy the air, water, or other natural resources. The only basis on which the trial court determined that plaintiffs had met their prima facie burden was that defendant's conduct violated two statutory standards: ILSA and the WPA. However, under MCL 324.1701(2), a trial court may only adopt a standard "fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state" if the standard is a pollution control standard. *Preserve the Dunes, supra* at 516-517. If the trial court adopts a standard from a statute or rule that is not a pollution control standard, the violation of that standard cannot serve as a prima facie violation of MEPA. *Id.* Therefore, we must determine whether ILSA and

---

[68] The GLPA is part 327 of the NREPA, MCL 324.32701 *et seq.*

the WPA are pollution control standards.[69] In order to make this determination, the purposes behind the statutes must be ascertained. If the purposes are to protect natural resources or to prevent pollution and environmental degradation, then the statutes are pollution control standards. *Nemeth, supra* at 36.

### a. ILSA

ILSA prohibits a person from doing the following activities without a permit: (a) dredging or filling bottomland, (b) constructing, enlarging, extending, removing, or placing a structure on bottomland, (c) erecting, maintaining, or operating a marina, (d) creating, enlarging, or diminishing an inland lake or stream, (e) structurally interfering with the natural flow of an inland lake or stream, (f) constructing, dredging, commencing, extending, or enlarging an artificial canal, channel, ditch, lagoon, pond, lake, or similar waterway for the purpose of connecting to an existing lake or stream, and (g) connecting any natural or artificially constructed waterway, canal, channel, ditch, lagoon, pond, lake, or similar waterway with an existing inland lake or stream for navigation or any other purpose. MCL 324.30102. ILSA defines "inland lake or stream" to include "a natural or artificial lake, pond, or impoundment; a river, stream, or creek which may or may not be serving as a drain[,] . . . or any other body of water that has definite banks, a bed, and visible evi-

---

[69] We note that the trial court could have utilized ILSA and the WPA in crafting the applicable common-law standard of impairment, but it would still have needed to describe that standard with sufficient detail and make the necessary findings to enable the development of the "common law of environmental quality." See *Ray, supra* at 307. In this case, the trial court did not craft an impairment standard utilizing ILSA and the WPA; rather, it stated that the violations of ILSA and the WPA alone sufficed to establish a prima facie violation of MEPA.

dence of a continued flow or continued occurrence of water," and defines "project" to be any activity that requires a permit under MCL 324.30102. MCL 324.30101(f) and (j). Finally, ILSA states that

> [t]he department shall issue a permit if it finds that the structure or project will not adversely affect the public trust or riparian rights. In passing upon an application, the department shall consider the possible effects of the proposed action upon the inland lake or stream and upon waters from which or into which its waters flow and the uses of all such waters, including uses for recreation, fish and wildlife, aesthetics, local government, agriculture, commerce, and industry. The department shall not grant a permit if the proposed project or structure will unlawfully impair or destroy any of the waters or other natural resources of the state. This part does not modify the rights and responsibilities of any riparian owner to the use of his or her riparian water. A permit shall specify that a project completed in accordance with this part shall not cause unlawful pollution as defined by part 31. [MCL 324.30106.]

Hence, under the relevant permitting standards of ILSA, the DEQ is tasked with analyzing the proposed project and determining whether the project will adversely affect the public trust or riparian rights. The DEQ is also required to assess the possible effects on the uses of such waters, "including uses for recreation, fish and wildlife, aesthetics, local government, agriculture, commerce, and industry." Likewise, the DEQ is ordered not to issue a permit if the project will impair or destroy the waters or other natural resources. The statute also makes it clear that ILSA does not affect riparian rights and that a permit shall specify that a project shall not cause unlawful pollution. MCL 324.30106. With the exception of the last sentence, there is no language within MCL 324.30106 that establishes a pollution control standard. Indeed, the entire permitting provision requires the DEQ to evaluate the

permit application to determine if the proposed project will adversely affect property rights or the existing uses of the waters or otherwise impair the waters or other natural resources. *Id.* While these instructions clearly encompass the consideration of possible polluting effects from the project, the purpose of the statute is not to prevent pollution or environmental degradation, but to protect the rights of current water users from potential harm.[70] Hence, ILSA is not a statute whose purpose is to "to prevent pollution and environmental degradation," *Nemeth, supra* at 36, and, therefore, is not a pollution control standard, the violation of which can support a prima facie violation of MEPA.[71]

### b. WPA

The WPA states that a permit shall not be approved "unless the department determines that the issuance of a permit is in the public interest, that the permit is necessary to realize the benefits derived from the activity, and that the activity is otherwise lawful." MCL 324.30311(1). The statute goes on to provide, "In determining whether the activity is in the public interest, the benefit which reasonably may be expected to accrue from the proposal shall be balanced against the reasonably foreseeable detriments of the activity. The decision

---

[70] In *Preserve the Dunes, supra* at 516-517, our Supreme Court noted that the statutes under consideration prohibited the DEQ from issuing a permit if the applicant's proposed conduct was likely to pollute, impair, or destroy the air, water, or other natural resources, but still determined that the permit statutes were not themselves designed to be pollution control standards. The Court explained that, "[a]s previously discussed, DEQ determinations of permit eligibility under §§ 63702(1) and 63704(2) are unrelated to whether the applicant's proposed activities on the property violate MEPA." *Id.* at 519.

[71] Because of our holding, we need not address whether defendant should have been required to obtain a permit under ILSA before beginning to pump water from Sanctuary Springs.

shall reflect the national and state concern for the protection of natural resources from pollution, impairment, and destruction." MCL 324.30311(2). The statute then lists a series of factors to be analyzed in balancing the benefits and harms of the proposed activity. *Id.* From this, it is clear that the WPA is not a pollution control standard. Indeed, the statute cannot be a pollution control standard because it specifically allows the DEQ to permit potentially harmful or polluting activities when it determines that the balance is in favor of the benefits over the harms. See *City of Portage v Kalamazoo Co Rd Comm*, 136 Mich App 276, 282; 355 NW2d 913 (1984) (noting that MEPA does not permit a prima facie case to be made by balancing the disadvantages against the advantages of the defendant's proposed action). Furthermore, the statute specifically limits its own application to specific acts, none of which includes the removal of groundwater. MCL 324.30304. Hence, the trial court erred when it determined that a violation of the WPA was capable of supporting a prima facie violation of MEPA.

Because the only statutes adopted by the trial court as MEPA standards were not pollution control standards, and the trial court failed to make the necessary findings "on which the plaintiff claims to have made a prima facie case," *Ray, supra* at 309, the trial court erroneously determined that plaintiffs had established a prima facie violation of MEPA. Consequently, we vacate the portion of the trial court's opinion that concluded that defendant's water withdrawals violate MEPA and remand this issue for determination by the trial court.

### 3. REMAND

On remand, the trial court shall examine the entire record and, giving due regard to the trial court's find-

ings of fact and credibility assessments, shall determine whether plaintiffs established a prima facie violation of MEPA and, if the court determines that plaintiffs met this burden, whether defendant rebutted plaintiffs' prima facie case. At its discretion, the trial court may conduct a hearing and request the submission of additional evidence on this issue. In order to provide some additional guidance on this inquiry, we shall address some relevant points.

### a. THE RESOURCES AT ISSUE

The first step in determining whether the plaintiff in a MEPA action has made out a prima facie violation is to identify the resource that has allegedly been polluted, impaired, or destroyed. *Kent Co Rd Comm v Hunting*, 170 Mich App 222, 233; 428 NW2d 353 (1988). Throughout the trial court's discussion of this issue, it addressed the nature of any impairment by reference to the harms to wetlands, lakes, and streams caused by defendant's pumping activities. Hence, the trial court determined, and we agree, that the relevant resources were the wetlands, lakes, and streams. However, because of the standing issue addressed in part IV(B), the only wetlands, lakes, and streams that the trial court may consider on remand are Thompson Lake, the Dead Stream, and the Dead Stream's wetlands. In addition, the trial court determined that this issue does not involve the pollution or destruction of these resources. Instead, the issue revolves around whether defendant's pumping activities at Sanctuary Springs impairs the identified resources. Therefore, the trial court shall limit itself accordingly.

### b. IMPAIRMENT

In order to promote the development of the common law of environmental quality, see *Ray*, *supra* at 307, we

urge the trial court to be as detailed as possible when describing what constitutes an impairment of the identified resources. In establishing the impairment standard, we note that, although we determined that ILSA and the WPA were not pollution control standards, the statutes may still serve as aids to the trial court when establishing a common-law impairment standard for the resources at issue. Furthermore, while the factors set forth in *City of Portage, supra* at 282, might also serve as a guide to the establishment of an impairment standard, we remind the trial court that these factors are not necessarily applicable to every case; rather, "each alleged MEPA violation must be evaluated by the trial court using the . . . standard appropriate to the particular alleged violation." *Nemeth, supra* at 35. Finally, if the trial court determines that defendant's water withdrawals violate MEPA, it shall determine what remedy is appropriate under the circumstances. In order to facilitate any future review by this Court, we urge the trial court to state with specificity how it determined the nature and extent of any remedy selected.

## V. INJUNCTIVE RELIEF

Defendant next argues that the trial court improperly granted injunctive relief when it failed to articulate the standards on which it could do so and because it was not warranted. Defendant further argues that, even if it were warranted to some degree, the trial court erred when it granted an injunction barring all pumping activities at Sanctuary Springs. However, because of our disposition of defendant's groundwater and MEPA issues, we need not address the propriety of the trial court's issuance of a complete injunction against defendant's withdrawal of water from the Sanctuary Springs site.

VI. PUBLIC TRUST

The trial court dismissed plaintiffs' public trust claim pursuant to a motion for summary disposition under MCR 2.116(C)(8). On cross-appeal, plaintiffs contend that the trial court did so because it mistakenly applied a narrow log-floatation test, which is properly applicable only to dead-end privately owned lakes, to the Dead Stream, rather than the more flexible valuable floatage test applicable to streams. Plaintiffs further contend that there are questions of fact concerning whether the Dead Stream is navigable under a test other than the log-floatation test and whether the public trust applies to the water and fish of the Dead Stream, even if the stream itself is not navigable. Finally, plaintiffs argue that, even if the public trust does not apply to the Dead Stream, this Court should expand the public trust doctrine to curtail water use that threatens to diminish flows or levels of water in a stream. We disagree with each contention and decline plaintiffs' invitation to expand the public trust doctrine.

A. STANDARD OF REVIEW

This Court reviews de novo the grant or denial of summary disposition to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion for summary disposition brought under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). "The purpose of such a motion is to determine whether the plaintiff has stated a claim upon which relief can be granted. The motion should be granted if no factual development could possibly justify recovery." *Id.* at 129-130.

### B. NAVIGABILITY AND THE PUBLIC TRUST

In *Bott v Natural Resources Comm*, 415 Mich 45; 327 NW2d 838 (1982), our Supreme Court was presented with two cases in which riparian property owners along dead-end lakes wanted to exclude the general public from utilizing their lakes for recreational purposes. The Court noted that it was the "established law of this state . . . that the title of a riparian or littoral owner includes the bed to the thread or midpoint of the water, subject to a servitude for commercial navigation of ships and logs, and, where the waters are so navigable, for fishing." *Id.* at 60. The Court further noted that the "public-trust doctrine applies only to *navigable* waters and not to all waters of the state." *Id.* at 71 (emphasis in original). Furthermore, the *Bott* Court specifically rejected overtures to adopt a recreational boating test for determining navigability, *id.* at 71-86, and instead affirmed the log-floatation test stated in *Moore v Sanborne*, 2 Mich 519 (1853). See *Bott, supra* at 61.

In *Moore*, our Supreme Court stated:

> The length and magnitude of many of our rivers, the occasions and necessities for their use, and the nature and character of our internal commerce, all require a liberal adaptation of those doctrines to our circumstances and wants, and to a condition of things, both as to capability of our streams for public use, and the occasion for such use, entirely different from, and in many respects altogether new to, those which concurred to establish the common law rule, and we accordingly find that in all the States that rule has been enlarged so as to meet the condition and wants of the public necessities of trade and commerce. [*Moore, supra* at 522.]

For this reason, the Court declined to adopt the strict navigable-in-fact rule that found "those rivers only are subject to the [navigational] servitude of the public

interests, which are of common or public use for carriage of boats and lighters, and for transportation of property." *Id.* at 523. Instead, the Court determined that "a capacity to float rafts and logs . . . is recognized as a criterion of the public right of passage and of use . . . ." *Id.* at 526. Furthermore, the Court held that the fact that a stream may not be able to float a mill log in an ordinary stage of water will not alter its navigable character. "It is a valuable, rather than a continual use, which determines the public right." *Id.*

The *Bott* Court rejected the notion that the log-floatation test in *Moore* was archaic and impractical. The Court explained:

> In many cases, there will undoubtedly be evidence whether a waterway was used for floating logs at an earlier time. Such evidence might justify a determination of navigability. If no reliable history is available, a litigant could produce evidence in at least two other ways. He might obtain a number of large logs and float them down the stream in question. Alternatively, he could establish navigability by surveying the body of water as the DNR did in the instant cases and comparing its dimensions (width, depth, rate of flow) to the reported dimensions of streams already found to be navigable. Comparison as well as other evidence would allow a court to make a sound determination without changing the test of navigability. [*Bott, supra* at 72 n 27.]

Hence, plaintiffs could have shown that the Dead Stream was navigable by presenting evidence that the stream was historically used to float logs, by demonstrating through tests that the stream can actually support the floatation of logs, or through comparison with streams already determined to be navigable.

During the summary disposition phase of this case, the trial court was presented with evidence regarding the logging activities that occurred in the vicinity of the

Dead Stream and on the stream's ability to actually float logs. In his deposition, Walter Welsh testified that the logs that were normally floated on the rivers were from 20 to 40 feet in length. Welsh also stated that shingle bolts were made from the stumps that remained and were from 16 to 18 inches in length. He also testified generally about the presence of narrow gauge railroads throughout the region that were used to transport the logs. In addition, the trial court had the affidavit of J. Stephen Alguire and his assessment of the Dead Stream's navigability.[72] In his assessment report, Alguire stated that he and Kevin Doyle successfully floated a shingle bolt along the Dead Stream and that it was his opinion that the Dead Stream was capable of floating commercial logs during its spring "freshening."

Although the floating of a shingle bolt may demonstrate that the Dead Stream is capable of floating a commercially viable log, *Moore* and *Bott* both require the floating of large mill logs to demonstrate navigability. *Moore, supra* at 526; *Bott, supra* at 72 n 27. Therefore, plaintiffs' shingle bolt experiment cannot support a finding of navigability. Furthermore, while Alguire noted historical evidence of shingle bolts within the Dead Stream, there was no evidence of mill logs within the stream, and Welsh's testimony established that, in this region, mill logs were transported by narrow gauge railroads. Hence, plaintiffs failed to present any historical evidence that the Dead Stream was used to float mill logs. Finally, in his deposition, Cozad testified that the Dead Stream ranged from six inches to two feet in depth. In *Bott*, the Court determined that the creeks in that case were too shallow to permit the floatation of logs because they were only six

---

[72] According to his affidavit, Alguire is a registered forester and has participated in lumbering activities in Maine.

and eight inches deep, respectively, at their shallowest points. *Bott, supra* at 60. Because there was no testimony establishing that the Dead Stream's level is raised significantly on a cyclical basis, the trial court properly concluded that the Dead Stream was not navigable under *Moore* and *Bott*.

### C. EXPANDING THE NAVIGABILITY TEST

Plaintiffs contend that *Bott* is properly applicable only to dead-end lakes rather than streams. We disagree with plaintiffs' characterization of the holding in *Bott*.

While *Bott* did deal with access to dead-end lakes, the primary holding centered on the navigability of the streams that connected the dead-end lakes ·to other bodies of water. *Bott, supra* at 60. Indeed, one of the parties in *Bott* had actually constructed a bridge across the stream that blocked the passage of boats from the larger body of water to the lake. *Id.* at 58 n 3. Furthermore, the Court never limited its holding reaffirming *Moore* to cases involving dead-end lakes and the streams leading into them, but repeatedly referred to lakes, rivers, and streams as well as generally to the property interests of littoral and riparian owners. *Bott, supra* at 62, 64, 66, 72 n 27, 73, 79, 81. Hence *Bott* reaffirmed the rule that the log-floatation test is the only navigability test for determining whether a lake or stream is navigable and, therefore, subject to the public trust doctrine.[73]

---

[73] Plaintiffs also erroneously argue, relying on *Bott, supra* at 57 n 1, that *Bott* established that "another way of demonstrating public trust or the public right of navigation on a lake or stream is to show the existence of *lawful* public access . . . ." However, that footnote only clarifies that, if there is public access to a lake, the public has the same rights to use the water as the littoral owners. *Id.* This is not the same as saying that the public trust extends to the lake.

Plaintiffs also contend that *Collins v Gerhardt*, 237 Mich 38; 211 NW 115 (1926), and *Attorney General ex rel Director of Conservation v Taggart*, 306 Mich 432; 11 NW2d 193 (1943), establish that the rule of navigability for streams is flexible and evolves with the needs of the public at large and, therefore, that this Court is free to modify the test for navigability. We disagree.

In *Bott*, our Supreme Court rejected this same argument. The Court explained, *"Collins* and *Taggart* hold only that the public may fish in streams found navigable under the rule of *Moore v Sanborne. Collins* and *Taggart* voiced no dissatisfaction with the log-floatation test, and applied that test to determine the navigability of the streams in question." *Bott, supra* at 68. Furthermore, the Court expressed its concern that, since *Moore*, many property owners have "invested their savings or wealth in reliance on a long-established definition of navigability." *Id.* at 79. The Court explained:

> In stating the log-floatation test of navigability the *Moore* Court did indeed establish a rule of navigability which varied from the English common law and the common law of many jurisdictions in the United States. In doing so, however, the Court was not overruling any binding precedent, for there was none on the issue at that early date in Michigan's history. The Court in *Moore* was writing on a blank slate—we are not. [*Id.* at 80.]

For this reason, the Court concluded that it was "not an appropriate forum for resolving the competing societal values which underlie this controversy," *id.* at 86, and chose to retain the log-floatation test for navigability rather than adopt a recreational boating test. Consequently, the log-floatation test described in *Bott* is the only applicable test for determining whether a lake or stream is navigable and thereby subject to the public trust.

### D. EXPANDING THE PUBLIC TRUST DOCTRINE

Plaintiffs also argue that all water within Michigan is property held in trust for the people regardless of the navigability of individual bodies of water. We disagree.

Plaintiffs mistakenly rely on *People v Collison*, 85 Mich 105; 48 NW 292 (1891), *People v Horling*, 137 Mich 406; 100 NW 691 (1904), and *Collins* for the proposition that the state holds all waters in trust for the public. In *Collison* and *Horling*, the Court was asked to determine the extent of the right of the state to regulate fishing. In *Collison*, the Court stated that, with regards to fish, it was immaterial who owned the land under the lake, because the lake was interconnected with other bodies of water and by "reason of [the] migratory habits [of fish], their ownership is in the whole people of the State, and no individual has any property right in them until they have been subjected to his control. To fish is a privilege accorded by the State, and the question of individual enjoyment is one of public privilege, and not of private right." *Collison*, *supra* at 108. Thus the Court in *Collison* merely recognized that one has no property rights in migratory fish until they are reduced to one's control, and that the state has the right to regulate the manner in which one can lawfully capture (i.e., reduce to one's control) fish. *Id*. In *Horling*, the Court upheld the state's power to regulate fishing on a body of water that was only intermittently connected to the Grand River for the same reasons. *Horling*, *supra* at 414-415. Read in conjunction, these cases stand for the proposition that the state has the general police power to regulate fishing on bodies of water that are interconnected with public waters and do not stand for the proposition that all fish (or water) are held in trust for the public.

Likewise, in *Collins*, our Supreme Court was presented with a case in which a riparian who owned the land on both sides of a river claimed the exclusive right to fish that section of the river. The Court determined that, although the title to the beds of navigable rivers had been passed to private owners, the rights to the overlying water and fish, by virtue of the public trust in *navigable* waters, remained with the general public. *Collins, supra* at 48-49. Hence, *Collins* also does not stand for the proposition that all waters are held in trust; rather, it affirms the rule that only navigable waters are held in trust for the public.

Plaintiffs also cite the Michigan Constitution and several statutes as proof that the state has placed all waters, including groundwater, within this state in trust.[74] Yet the Constitution and the statutes cited merely recognize the importance of natural resources, including water, and exhort the Legislature to exercise its police power to conserve them. The Constitution and the statutes cited do not attempt to claim ownership of water by the state itself. Indeed, this state has long recognized that private persons obtain property rights in water on the basis of their ownership of land. See *Dumont, supra* at 422-424; *Schenk, supra* at 82-84; *Bott, supra* at 64. Therefore, the trial court properly determined that water, while a resource common to all Michigan citizens, is neither owned by the state nor subject to the public trust absent a determination that the body of water in question is navigable.[75]

---

[74] Plaintiffs cite Const 1963, art 4, § 52 (requiring the Legislature to provide for the protection of the air, water, and other natural resources), MEPA, ILSA, and the GLPA (stating that the waters of the state are a valuable natural resource held in trust by the state).

[75] See also *Bott, supra* at 71 (holding that the "public-trust doctrine applies only to *navigable* waters and not to all waters of the state") (emphasis in original).

### E. CONCLUSION

The trial court properly determined that, under Michigan law, water as a general resource is not subject to the public trust and, therefore, that plaintiffs failed to state a claim under count V of their complaint. The trial court also properly determined that the only bodies of water subject to the public trust were those lakes and streams that meet the log-floatation test for navigability first described in *Moore* and affirmed in *Bott*. Because the trial court did not err when it determined that the Dead Stream did not meet the log-floatation test, the trial court properly dismissed plaintiffs' public trust claim.

### VII. TAXATION OF COSTS

Defendant next argues that the trial court erred when it granted plaintiffs' motion for costs as prevailing parties. Specifically, defendants argue that the trial court abused its discretion by accepting plaintiffs' characterization of their expert witness fees as being for "Trial time" without independently evaluating the fees to determine whether they were reasonable or properly designated. We agree.

### A. STANDARD OF REVIEW

This Court reviews an award of costs for an abuse of discretion. *Badiee v Brighton Area Schools*, 265 Mich App 343, 377; 695 NW2d 521 (2005). However, what constitutes costs is governed by statute, *J C Bldg Corp II v Parkhurst Homes, Inc*, 217 Mich App 421, 429; 552 NW2d 466 (1996), and questions of statutory construction are reviewed de novo. *Macomb Co Prosecutor v Murphy*, 464 Mich 149, 157; 627 NW2d 247 (2001).

B. ANALYSIS

Under the Michigan Court Rules, a prevailing party is generally entitled to costs, "unless prohibited by statute or by these rules or unless the court directs otherwise, for reasons stated in writing and filed in the action." MCR 2.625(A)(1). What constitutes "costs" under the court rules is determined by reference to the Revised Judicature Act. See MCL 600.2401 *et seq.* Under MCL 600.2405(2), "costs" include matters specially made taxable elsewhere in the statutes or court rules.

In the present case, plaintiffs requested costs as prevailing parties under MCR 2.625 and specifically requested the taxation of their expert witness fees pursuant to MCL 600.2164 and MCL 324.1703(3).[76] Defendants objected to plaintiffs' request for various costs, including an objection to plaintiffs' expert witness fees as excessive and outside the scope of the statutes authorizing them to be taxed.

An expert is not automatically entitled to compensation for all services rendered. *Hartland Twp v Kucykowicz*, 189 Mich App 591, 599; 474 NW2d 306 (1991). " 'The burden of proving fees rests upon the claimant of those fees.' " *Campbell v Sullins*, 257 Mich App 179, 201; 667 NW2d 887 (2003), quoting *Petterman v Haverhill Farms, Inc*, 125 Mich App 30, 33; 335 NW2d 710 (1983). In *Detroit v Lufran Co*, 159 Mich App 62, 67; 406 NW2d 235 (1987), the Court determined that experts are properly compensated for court time and the time required to prepare for their testimony as experts. The Court further stated, "[W]e do not regard conferences with counsel for purposes such as educating counsel

---

[76] Defendant does not contest on appeal the validity of any costs other than plaintiffs' expert witness fees.

about expert appraisals, strategy sessions, and critical assessment of the opposing party's position to be properly compensable as expert witness fees." *Id.* Furthermore, in *Oscoda Chapter of PBB Action Comm, Inc v Dep't of Natural Resources*, 115 Mich App 356, 362; 320 NW2d 376 (1982), the Court held that former MCL 691.1203(3), now codified at MCL 324.1703(3), did not alter the ordinary definition of costs; rather, the statutory authority for costs is found at MCL 600.2401 *et seq.* Hence, the costs allowed under MEPA are the same as the costs allowed under the Revised Judicature Act.

In the present case, plaintiffs presented more than 100 pages of itemized expenses and receipts and five affidavits in three separate briefs to the trial court in support of their motion for costs. On May 7, 2004, the trial court held a hearing on the costs. At the hearing, plaintiffs' counsel presented the court with an itemized list of all expert fees with a designation indicating whether the fee was related to trial preparation or some other category. Plaintiffs' counsel then addressed the nature of several disputed items from the itemized list, explaining in detail why he believed they were properly taxable. Plaintiffs also argued that the trial court was not bound by the limited definition of expert witness fee costs and could award the full fees regardless of whether the fee was related to trial preparation, and even argued that the trial court could award more fees than were actually charged in the case of one expert witness who undercharged the plaintiffs. Defendant objected to several expert witness fees as unreasonable, but did state that it had no objection to some fees, including all of Luttenton's fees.

After hearing the parties' arguments, the trial court determined that the costs referred to under MEPA are the costs permitted by statute and, therefore, that it

had no authority to award costs beyond those established by the Revised Judicature Act. The court then noted that what constituted taxable costs for expert witness fees has been limited by case law, but still awarded plaintiffs all costs that they claimed were for trial preparation. In doing so, the trial court explained that

> [t]he problem when applied to this case is that as I referred to in my first opinion, . . . there was a learning curve for the experts and counsel. I believe that this whole area of hydrology effects and impacts, what this all meant evolved with time and, as such, the things that seem prohibited by the language I just quoted from the [*Hartland Twp*] case are inextricably intertwined with the sorts of things that are clearly recoverable, and to try to back those out would be virtually impossible.
>
> It would be an extraordinary effort here to go through the extensive materials attached to the affidavits to determine minute by minute how much of each would be pure consultation and as to how many minutes of each of those would be related to actually getting the witness prepar[ed] for trial testimony.

The court also refused to award fees greater than those actually incurred by plaintiffs and refused to give expert witness fees for nonexperts, as requested by plaintiffs' counsel. Finally, after all the evidence had been presented, the trial court awarded plaintiffs $119,869.97 in expert witness fees and $2,342.50 in other taxable costs, for a total of $122,212.47.

In light of this record, the trial court abused its discretion. The trial court had ample evidence from which to assess the reasonableness of plaintiffs' requested expert witness fees, but determined that it would be too difficult to separate the taxable costs from the nontaxable costs. The trial court's decision to simply accept plaintiffs' characterization of the expert

witnesses' activities, even though it believed that some of the fees were likely nontaxable expenses, cannot be justified and, consequently, constituted an abuse of discretion.

### C. CONCLUSION

Because the trial court improperly awarded costs to plaintiffs that are not taxable under the applicable statutes, the award must be reversed and remanded for recalculation.

### VIII. APPORTIONMENT OF COSTS UNDER MEPA

Defendant also argues that the trial court abused its discretion when it amended its order under MCR 2.612(C)(1)(f) to correct plaintiffs' oversight in failing to request an apportionment of costs under MEPA.[77] Because of our disposition of the groundwater and MEPA issues, we need not address whether the trial court improperly amended its order granting costs to include an apportionment under MEPA.

### IX. CONCLUSION

The trial court did not clearly err in making its findings of fact and did not abuse its discretion when it refused to reopen the proofs. Therefore, a new trial on those grounds is not warranted.

While the trial court improperly applied the wrong law to plaintiffs' groundwater claim, it correctly determined that defendant's water withdrawals from Sanctuary Springs violated plaintiffs' riparian rights in the Dead Stream. Therefore, we affirm the trial court's holding to that effect. However, we remand this issue to

---

[77] See MCL 324.1703(3).

the trial court to determine what level of water extraction from Sanctuary Springs will provide defendant with a fair participation in the common water supply while maintaining an adequate supply for plaintiffs' water uses. After making its determination, the trial court shall modify its original injunction accordingly.

The trial court improperly relied on defendant's purported violations of ILSA and the WPA to establish a prima facie violation of MEPA. Because these statutes do not contain pollution control standards, the violation of either of these statutes will not, by itself, establish a prima facie violation of MEPA. Therefore, in order to determine that plaintiffs had made out a prima facie case, the trial court needed to make specific findings that defendant's conduct would impair the resources in question, which it did not do. Consequently, the trial court erroneously determined that plaintiffs had met their prima facie burden. For these reasons, it is necessary to remand this issue to the trial court.

On remand, the trial court shall determine the applicable standard for impairment of the resources at issue and shall determine, on the entire record and giving due respect to the trial court's earlier findings and credibility assessments, whether plaintiffs have established a prima facie violation of the standard with respect to Thompson Lake, the Dead Stream, and the Dead Stream's wetlands. If the trial court determines that plaintiffs have met their prima facie burden, the trial court shall determine whether the record supports the conclusion that defendant rebutted that prima facie case. If the trial court determines that defendant failed to rebut plaintiffs' prima facie case, it shall enter an appropriate remedy.

The trial court did not err when it concluded that the Dead Stream was not subject to the public trust doctrine.

The trial court abused its discretion when it awarded expert witness fee costs to plaintiffs that were not authorized by statute or court rule. However, because plaintiffs are prevailing parties, the award of costs is still appropriate. Therefore, we reverse the trial court's grant of costs to plaintiffs and remand for the recalculation of costs consistent with this opinion.

Finally, the stay issued by this Court, see unpublished order of the Court of Appeals, entered December 16, 2003 (Docket No. 252717), shall remain in force unless modified by the trial court. However, this stay shall be modified to permit defendant to pump not more than a weekly average of 200 gpm. This stay shall expire after the trial court enters the modified injunction, as discussed in part III(D) and issues an order for relief, if warranted, under plaintiffs' MEPA claim.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.[78] We retain jurisdiction.

MURPHY, P.J. (*concurring in part*). It is my position that plaintiffs have standing with respect to all the natural resources at issue, which include wetlands 112, 115, and 301, the Osprey Lake impoundment, Thompson Lake, the Dead Stream, and the Dead Stream's wetlands. Accordingly, on remand, the trial court should be permitted to entertain arguments and render

---

[78] Because of the complexity of the evidence, issues, and procedural posture of this case, we strongly urge that Judge Root, who ably presided over the lower court proceedings, be brought out of retirement to preside over this case on remand.

a decision concerning these natural resources relative to the claim under the Michigan environmental protection act (MEPA), MCL 324.1701 *et seq*. I am otherwise in agreement with Judge SMOLENSKI's lead opinion and the analysis and reasoning contained in it with regard to the conclusion that remand is necessary on the MEPA claim in order for the trial court to properly determine whether plaintiffs established a prima facie violation of MEPA. I would simply not limit the remand order to consideration of solely the Dead Stream, the Dead Stream's wetlands, and Thompson Lake in light of my position on standing. In all other respects, I concur with the lead opinion.

I conclude that plaintiffs have standing because of the complex, reciprocal nature of the ecosystem that encompasses the pertinent natural resources noted above and because of the hydrologic interaction, connection, or interrelationship between these natural resources, the springs, the aquifer, and defendant Nestlé's pumping activities, whereby impact on one particular resource caused by Nestlé's pumping necessarily affects other resources in the surrounding area. Therefore, although there was no evidence that plaintiffs actually used or physically participated in activities on the Osprey Lake impoundment and wetlands 112, 115, and 301, environmental injuries to those natural resources play a role in any harm caused to the Dead Stream, the Dead Stream's wetlands, and Thompson Lake, which are used by and adjacent to property owned by plaintiffs and not the subject of a standing challenge. As such, plaintiffs suffered an injury in fact or an invasion of a legally protected interest where concrete harm was caused not only to the natural resources bounding their property, but also the other outlying

resources.[1] See *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 628-629; 684 NW2d 800 (2004) (setting forth judicial standing elements), quoting *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 739; 629 NW2d 900 (2001), quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992). In other words, plaintiffs were legally entitled to complain and file suit regarding alleged injuries to wetlands 112, 115, and 301, as well as the Osprey Lake impoundment, if those injuries were also caused by Nestlé's pumping activities and affected the injuries and harm done to the natural resources for which standing is not at issue.

Because plaintiffs have standing with respect to all the natural resources under the general standing principles cited in *Cleveland Cliffs,* without the need to rely on MEPA's less demanding standing provision, MCL 324.1701(1), there is no need to determine the constitutionality of MCL 324.1701(1).

I respectfully concur.

WHITE, J. (*concurring in part*). I join in Judge SMOLENSKI's lead opinion with respect to the groundwater and public trust claims, as well as the ancillary issues. I join in Judge MURPHY's opinion regarding standing under the Michigan environmental protection act (MEPA), MCL 324.1701 *et seq.*, and agree that the Legislature's grant of standing under the facts of the instant case does not unconstitutionally expand the judicial power of the courts.

I write separately with regard to the lead opinion's discussion of the trial court's MEPA analysis. While I

---

[1] Whether the injury, invasion, or harm is sufficiently significant to constitute a MEPA violation and require a level of enjoinment is to be determined on remand.

agree that a mere failure to obtain a permit under the inland lakes and streams act (ILSA), MCL 324.30101 *et seq.*, and the wetlands protection act (WPA), MCL 324.30301 *et seq.* does not establish a prima facie violation of MEPA, I do not read the trial court's opinion as erroneously adopting ILSA's and the WPA's permitting provisions as applicable pollution control standards, the violation of which automatically establishes a violation of MEPA. Rather, the court expressly stated its understanding that this case involves impairment and not pollution.[1]

The trial court's opinion also demonstrates that it recognized its duty to develop a judicial common law of environmental quality and make detailed findings of fact under *Ray v Mason Co Drain Comm'r*, 393 Mich 294; 224 NW2d 883 (1975), and that it referred to the ILSA and the WPA statutes for guidance in developing an impairment standard. What is lacking in the trial court's opinion, however, is a qualitative discussion of the impairments found by the court. While the court's MEPA analysis referred to, and adopted, its findings of fact, and further discussed the Department of Environmental Quality's incorrect interpretation of the acts as not applying to the instant situation, the court did not explain how its earlier findings revealed a level of impairment that required judicial intervention under MEPA. I believe such a discussion is required under the case law. Therefore, I concur in the remand.

---

[1] The court stated:

> The task then becomes one of finding or establishing a standard or standards to measure Defendants' water-extraction activities against to determine if such actions result in the impairment of the natural resources involved in this case (destruction or pollution are not argued as being involved in Plaintiffs' MEPA claim, only impairment).